[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 31, 2006
THOMAS K. KAHN
CLERK

No. 04-14894

_____

D. C. Docket No. 00-03181-CV-JOF-1

FINANCIAL SECURITY ASSURANCE, INC.,

Plaintiff-Appellant,

versus

STEPHENS, INC.,
HAYES, JAMES & ASSOCIATES, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 31, 2006)

Before TJOFLAT and KRAVITCH, Circuit Judges, and LAWSON[*], District
Judge.

_____

[*] Honorable Hugh Lawson, United States District Judge for the Middle District of
Georgia, sitting by designation.

KRAVITCH, Circuit Judge:

The primary issue presented in this case is whether an insurer of municipal bonds that becomes the owner of those bonds upon default has standing pursuant to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The plaintiff, Financial Security Assurance, Inc. ("FSA"), appeals the district court's orders dismissing its Rule 10b-5 claim and granting summary judgment in favor of defendants Stephens, Inc. ("Stephens") and Hayes, James & Associates, Inc. ("Hayes James") on its claims for common law fraud and negligent misrepresentation. After thorough review, we reverse the district court's dismissal of the Rule 10b-5 claim and remand the matter for further proceedings consistent with this opinion. We affirm the district court's grant of summary judgment on the fraud and negligent misrepresentation claims.

## I. Facts

In the early 1990s, Crisp County, Georgia approved plans for a regional solid waste processing facility (the "Facility"), which would extend the life of a newly-opened landfill by removing recyclable material from waste before dumping the remainder into the landfill. The County established the Solid Waste Management Authority of Crisp County (the "Authority") to construct and operate

2

the Facility. To finance its initial construction, the Authority obtained approximately $53 million in short-term bank loans in 1996 (the "Bank Financing").

Once constructed, the Authority would obtain revenue for the Facility by accepting waste from cities, counties and private companies and by selling materials of value ("MOV") from the waste it collected. Accordingly, before the Facility was built, the Authority contracted with more than thirty of these entities (the "Participants"), each of which agreed to make minimum payments to the Authority based on the expected tonnage of waste the Authority would collect or the number of households the Authority would service in the city or county. They executed "put or pay" contracts. The Authority also contracted with TransWaste Services LLC ("TransWaste"), a waste hauler, to pick up the Participants' waste and deliver it to the Facility, paying a tipping fee for each ton delivered. TransWaste agreed to deliver enough waste for the Authority to break even. In turn, the Authority agreed that TransWaste would receive a rebate from the Authority's revenues from the sale of recyclable MOV.

The Authority contracted with defendant Hayes James for civil engineering services, including the conduct of a feasibility study based on the Bank Financing and the preparation of a report on the results of an Acceptance Test that Hayes

3

James had developed for the Facility's equipment.

The Authority hired Stephens to act as underwriter for a bond financing for the Facility. In early 1998, Stephens prepared a Request for Proposal ("RFP") for potential credit enhancers, including FSA. The RFP included a pro forma financial representation (the "Pro Forma"). The RFP's disclaimer instructed potential credit enhancers to perform their own due diligence.

FSA assigned one of its employees, Margaret Gifford, to analyze the RFP and make a recommendation as to whether FSA should insure the bonds. Gifford toured the Facility and obtained information about the equipment, the quantities of waste delivered and processed, and the amount of MOV recovered. She recommended that FSA insure the bonds. Gifford's report noted that the Authority's contracts were the ultimate security for the bond issue. She reviewed only one sample contract between the Authority and a Participant, however, and she did not request copies of the contracts with TransWaste or with Crisp County. Gifford testified in her deposition that she did not perform any due diligence after July 28, 1998.

FSA submitted a bid in late July 1998, which was later accepted. The bid was conditioned on full review of all legal documentation pertaining to the deal.

The RFP indicated that the Facility would be subjected to an Acceptance

4

Test to ensure that the Facility met its design specifications. Hayes James supplied the Acceptance Test's design specifications for inclusion in the RFP, based on the original contract created in connection with the Bank Financing. Hayes James made a few minor changes to these specifications and then provided them to Stephens for inclusion in the RFP. The Acceptance Test was administered after FSA agreed to insure the bonds. FSA never requested a copy of the test results, nor did it inquire as to how the Facility performed.

After Stephens accepted FSA's bid, Stephens's counsel prepared a Preliminary Official Statement (the "POS") for the Authority. Though her duties were officially finished by that point, Gifford testified that she did "glance at" the POS when it was provided to FSA. Ron Millet, in-house counsel for FSA, also testified that he read and made suggestions regarding at least one draft of the POS.

In October 1998, at the request of TransWaste, the Authority and TransWaste executed an amendment to their contract. The amendment extended the period for which TransWaste was eligible for its rebate based on MOV receipts and delayed enforcement of the break-even guarantee requirement. Stephens did not notify FSA of this amendment or the conversations that led to it. Also in October, Stephens, Hayes James and the Authority prepared a first-year budget for the Authority, which was sent to FSA. Hayes James also provided a budget

5

certification letter (the "BCL"), certifying that the budget was reasonable.

The bond transaction closed on November 12, 1998 (the "Bond Closing"). The final version of the Official Statement (the "OS") was delivered to FSA just prior to the closing. Within two months of the Bond Closing, the Authority informed FSA that it was revising its budget and cash flow analysis. FSA terminated Gifford's employment shortly thereafter, based in part on her performance in this transaction. The Authority and TransWaste then further amended their contract by reducing the tipping fee and relieving TransWaste of its tonnage guarantee. Eventually, the Authority exhausted its debt service reserve fund and was unable to continue make payments on the bonds.

In anticipation of litigation, the parties to this action entered into a tolling agreement on March 29, 2000. On December 1, 2000, FSA brought the present action in the United States District Court for the Northern District of Georgia, alleging federal securities fraud under Rule 10b-5 against Stephens, and state law claims for fraud and negligent misrepresentation against both Stephens and Hayes James. The district court later granted Stephens's Rule 12(b)(6) motion to dismiss the federal securities claim. After a period of discovery, the defendants moved for summary judgment on the state law claims, which the district court granted, based primarily on FSA's failure to meet the due diligence requirements for justifiable

6

reliance under Georgia law. FSA then filed the instant appeal.

## II. Discussion

A. 10b-5 Standing

The district court dismissed FSA's Rule 10b-5 claim on the ground that FSA was not a purchaser or seller of securities as required by the Rule's authorizing statute, § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and thus lacked standing to bring the claim. In Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the Supreme Court endorsed the standing rule created by Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2d Cir. 1952), which permits only purchasers and sellers of securities, and those with contracts to purchase and sell securities, to bring suit under Rule 10b-5. The Blue Chip Stamps Court noted that three principal categories of plaintiffs are excluded from standing: (1) "potential purchasers of shares ... who allege that they decided not to purchase because of" the alleged violations; (2) "actual shareholders in the issuer who allege that they decided not to sell their shares because of" the alleged violations; and (3) "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5." Blue Chip Stamps, 421 U.S. at 737-38. Stephens contends that FSA is thus excluded.

7

We review de novo a district court's dismissal of a complaint for failure to state a claim upon which relief could be granted, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. Roberts v. Fla. Power & Light Co., 146 F.3d 1305, 1307 (11th Cir. 1998). Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is, as we have stated previously, 'exceedingly low.'" Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citing Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev., 711 F.2d 989, 995 (11th Cir. 1983)). That said, "while notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001) (quoting In re Plywood Antitrust Litig., 655 F.2d 627, 641 (5th Cir. Unit A Sept. 8, 1981)).

FSA contends that it has standing on four grounds: (1) as the true party at

8

risk in this transaction, it was effectively the purchaser of the bonds; (2) it is entitled to standing as a guarantor of the bonds; (3) it actually purchased the securities pursuant to the terms of the insurance policy; and (4) it is fully subrogated to the rights of the individual bondholders and therefore entitled to bring suit based on their purchases.

### i. Party At Risk

FSA suggests that as the true "party at risk" in the bond transaction, it should have standing to assert a claim under Rule 10b-5. That is, FSA argues that it satisfies the purchaser-seller requirement set forth in <u>Birnbaum</u> and endorsed by the Supreme Court in <u>Blue Chip Stamps</u>, because, as the insurer of the bonds, it bore the risk that a purchaser would ordinarily bear. FSA is mistaken, however, in interpreting the purchaser-seller requirement to entail a functional, and not a formal, inquiry. Although the Supreme Court discussed the functional aspects of the rule in its reasoning, the Court deliberately endorsed a standing rule that would not be subject to "endless case-by-case erosion" by courts employing a functional analysis to every new group of potential plaintiffs. <u>See</u> <u>Blue Chip Stamps</u>, 421 U.S. at 755. Accordingly, FSA's assumption of risk in the bond transaction does not provide it with Rule 10b-5 standing.

### ii. Guarantor Standing

FSA argues that it also has standing as a guarantor of the bonds. FSA first argues that it has standing as a guarantor because a guarantor qualifies as a purchaser of securities. This is not so. Granting standing to a guarantor as a purchaser would contravene the rule that this court announced in Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550 (11th Cir. 1989), that, consistent with Blue Chip Stamps, a plaintiff must have actually purchased or sold, or entered into an enforceable contract to purchase or sell, securities to have standing under Rule 10b-5. Id. at 1554-55.

FSA next advances the novel theory that, in insuring the bonds, it sold a security, i.e., a guaranty. This argument fails because a guaranty does not qualify as a security for Rule 10b-5 purposes. Section 3(a)(10) of the Exchange Act defines a "security" as follows:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt of, or warrant or right to subscribe to or purchase, any of the foregoing ...

15 U.S.C.A. § 78c(a)(10). As the foregoing definition does not include a guaranty, FSA lacks standing as a guarantor of the bonds.

### iii. Contract to Otherwise Acquire the Bonds

FSA argues that its insurance policy constitutes a contract to purchase the Bonds, qualifying FSA as a purchaser pursuant to Blue Chip Stamps. Notably, § 3(a)(13) of the Exchange Act defines the term "purchase" to include "any contract to buy, purchase, or otherwise acquire" securities. See 15 U.S.C. § 78c(a)(13) (emphasis added). The policy provides that

> [u]pon disbursement in respect of a Bond, [FSA] shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by [FSA] hereunder.

Accordingly, FSA contends that it acquired a contingent interest in the bonds because the policy constitutes a contract to otherwise acquire them upon the occurrence of a specified contingent event, i.e., default.

Stephens argues first that FSA failed to allege a crucial element of a Rule 10b-5 action in its complaint – that it had purchased or sold a security. As Stephens notes, FSA did not specifically allege that it had entered into a contract to acquire the bonds. Nor did FSA attach the insurance policy or quote relevant terms of the policy in its complaint. Indeed, on reading the allegations in FSA's complaint, one could understand FSA to be advancing a theory of standing based solely on the fact that it suffered economic harm as a result of the defendant's

11

alleged fraud, a basis that was rejected in Blue Chip Stamps.

Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir. 1997). This court recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999); Brooks, 116 F.3d at 1368-69. Here, FSA refers to the existence of the insurance policy and relies on the effect of the policy – that FSA is thereby required to make payments to the bondholders – though it does not quote from the policy or discuss its specific provisions. The question, then, is whether the policy is nevertheless "central" to FSA's federal securities claim.

In considering this question, the First Circuit has held, with respect to a complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's motion to dismiss was central to the plaintiffs' claim because "Plaintiffs unquestionably would have had to offer a copy of the article in order to prove their case." Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988). According to that standard – whether the

12

plaintiff would have had to offer the document in order to prove its case – the policy would appear to be central to FSA's claim, for FSA would ultimately have to offer a copy of the policy to prevail under any conceivable theory of its case.

This case presents a closer question than most cases in which this issue arises, however. Although the purpose of this exception is to prevent a plaintiff from surviving a motion to dismiss by failing to append relevant documents to its complaint, see, e.g., 188 LLC v. Trinity Indus. Inc., 300 F.3d 730, 735 (7th Cir. 2002), here the exception would inure to the benefit of the plaintiff. Nevertheless, the potential harm that courts are mindful of in these situations is the lack of notice that the attached document may be considered by the court. See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Because Stephens attached the policy to its motion to dismiss, we cannot find that Stephens lacked notice that the district court or this court might consider the document. Accordingly, we will consider the policy appended to Stephens's motion to dismiss as part of the pleadings because it is referred to in the complaint, it is central to FSA's federal securities claim, its consideration comports with the requirements of notice pleading, and neither party challenges its authenticity.

13

Because the insurance policy is the mode by which FSA arguably "otherwise acquired" the bonds, we find that the complaint, vague as it is, nevertheless meets the liberal notice pleading standards embodied in the Federal Rules of Civil Procedure. Because FSA alleges that it issued the policy as a result of Stephens's fraud and that Stephens is therefore subject to Rule 10b-5 liability, we can infer that FSA purchased or sold securities by issuing the policy. Given these allegations and the provision of the policy vesting ownership of the bonds in FSA upon disbursement, we cannot conclude that FSA's complaint fails to meet the "exceedingly low" threshold necessary to survive a motion to dismiss. Quality Foods de Centro Am., S.A., 711 F.2d at 995. As FSA could conceivably prove a set of facts, consistent with the allegations in its complaint, that would entitle it to relief, the district court erred in dismissing its Rule 10b-5 claim. See Conley, 355 U.S. at 45-46.

In addition to asserting the above pleading defect, Stephens contends that the insurance policy does not constitute an "enforceable contract" to purchase securities. Stephens claims that the ownership clause in the policy is not enforceable because there is (1) no purchase price, (2) no provision for delivery of the bonds to FSA, and (3) uncertainty regarding FSA's post-disbursement rights. This argument is without merit. First, under FSA's contingent interest theory, no

14

purchase price would appear in the insurance contract because the "purchase price" would effectively be the risk assumed by FSA in choosing to insure the bonds, less the value of the premiums charged. Second, the lack of provision for delivery of the bonds would not render the contract unenforceable. A court could fill in this missing term if FSA were to sue on the policy. Finally, a sensible reading of the relevant provision in the insurance policy reveals no uncertainty as to FSA's post-disbursement rights. Although Stephens interprets the word "or" in the relevant clause – "[FSA] shall become the owner of the Bond, any appurtenant coupon to the Bond <u>or</u> right to receipt of payment of principal of <u>or</u> interest on the bond" – to be disjunctive, creating uncertainty as to FSA's rights, a more reasonable interpretation is that both appearances of the word "or" are in the conjunctive. Thus, the most reasonable interpretation of this clause indicates that FSA shall become the owner of the Bond, any appurtenant coupon and right to receipt of payment of principal of and interest on the bond. Statutory interpretation conventions indicate that courts need not mechanically interpret every "or" as disjunctive, but rather that courts should interpret the word "or" according to context. <u>See, e.g.</u>, <u>Union Ins. Co. v. United States</u>, 73 U.S. (6 Wall.) 759, 764 (1867) ("[W]hen we look beyond the mere words to the obvious intent we cannot help seeing that the word 'or' must be taken conjunctively."); <u>United States v.</u>

15

Hodge, 321 F.3d 429, 436 (3d Cir. 2003); Willis v. United States, 719 F.2d 608, 612-13 (2d Cir. 1983) ("It is settled that 'or' may be read to mean 'and' when the context so indicates."). The same is true of contract interpretation. See Noell v. Am. Design, Inc., Profit Sharing Plan, 764 F.2d 827, 833 (11th Cir. 1985) ("It is an established principal that '[t]he word 'or' is frequently construed to mean 'and,' and vice versa, in order to carry out the evident intent of the parties.'") (quoting Dumont v. United States, 98 U.S. 142, 143 (1878)).

Stephens also argues that FSA cannot constitute a purchaser of the bonds because, as a factual matter, FSA has not actually acquired the bonds (i.e., the bonds are still in the physical possession of the original bondholders). To the extent that FSA has an enforceable contract to otherwise acquire the bonds, however, it has an ownership interest in the bonds regardless of whether it has physical possession of them. Moreover, pursuant to the terms of the policy, ownership automatically vested in FSA upon disbursement. Accordingly, the fact that the bonds continue to be "held by" the bondholders is of no moment.

The Bond Market Association filed an amicus curiae brief in support of Stephens, arguing that an insurance policy is a fundamentally different instrument than contracts to purchase securities and that it therefore falls outside the purview of § 10(b) of the Exchange Act. According to the Bond Market Association,

16

whereas a conditional right to purchase a security (e.g., an options contract)

represents an "investment decision," an insurance policy represents only a "risk

decision."  In other words, an insurer decides what premium to charge based on

the risk of default rather than its beliefs regarding the future value of the

investment.  Thus, the inclusion in FSA's policy of a provision making FSA the

owner of the bonds upon default may suggest that FSA calculated the premium it

charged based not only on the risk of default, but also on the expected recovery

value of the bonds upon default.

An analogous situation arises where a bank accepts a security as collateral

for a loan.  The bank realizes any appreciation or depreciation in the value of the

collateral only in the event of default.  Nevertheless, the Supreme Court has

indicated that such pledges of securities fall within the purview of the securities

laws.  See Rubin v. United States, 449 U.S. 424, 429-31 (1981) (holding that

pledging securities as collateral for a loan constitutes an "offer or sale" under §

17(a) of the Securities Act)[1]; Marine Bank v. Weaver, 455 U.S. 551, 554 n.2

---

[1] The petitioner in Rubin v. United States, 449 U.S. 424 (1989), had been convicted of making false representations to a bank concerning shares of stock that were pledged as collateral for loans. Id. at 425-27.  In upholding the conviction, the Supreme Court held that "obtaining a loan secured by a pledge of shares of stock unmistakably involves a 'disposition of [an] interest in a security, for value'" and therefore qualifies as a sale under the Securities Act. Id. at 429. Although the definition of "offer or sale" under the Securities Act differs from that under the Exchange Act (the Securities Act definition includes the disposition of "an interest in a security"), Marine Bank v. Weaver, 455 U.S. 551 (1982), indicates that the reasoning of Rubin also applies to suits brought under § 10(b) of the Exchange Act. Id. at 554 n.2.

(1982) (indicating, in a Rule 10b-5 case, that Rubin resolved the circuit split over whether "a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws" and making no distinction between the Securities Act and the Exchange Act for these purposes). In so holding, the Court explained that "[t]he economic considerations and realities present ... are similar in important respect[s] to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities ...." Rubin, 449 U.S. at 431. Just as a bank relies on the value of the securities pledged as collateral when deciding whether to issue a loan and, if so, what interest rate to charge, a bond insurer may well consider the expected recovery value of bonds in deciding whether to insure them and, if so, what premium to charge.

Nor does FSA's status as a sophisticated institution deprive it of protection under § 10(b), for banks are also sophisticated parties and nevertheless benefit from such protection. The Bond Market Association, however, argues that FSA differs from other investors in another relevant respect: A bond insurer is on the deal team and is therefore in a superior position with respect to the investors the Exchange Act was intended to protect both in terms of its ability to perform due diligence and its ability to negotiate changes in the structure of a transaction. This

18

argument is unpersuasive. No case law exists suggesting that members of a deal team are not entitled to rely on representations made in offering documents relating to public offerings of securities. We see no reason to exclude members of a deal team from the universe of parties that have standing under § 10(b) and Rule 10b-5. Accordingly, we hold that FSA has standing as a purchaser of a contingent interest in the bonds.

### iv. Subrogation

Finally, FSA argues that it has standing based on subrogation. "Subrogation is '[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.'" Jones Motor Co. v. Anderson, 602 S.E.2d 228, 230 (2004) (quoting Black's Law Dictionary 1427 (6th ed. 1990)). See also Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-37 (1962). Subrogation is either "legal" or "conventional." Legal subrogation is an equitable doctrine and arises by operation of the law without any agreement to that effect between the parties; conventional subrogation rests on contract, arising where "an agreement is made that the person paying the debt shall be subrogated to the rights and remedies of the original creditor." Gilbert v. Dunn, 128 S.E.2d 739, 740 (Ga. 1962); State Farm Mut. Auto. Ins. Co. v. Cox, 515

S.E.2d 832, 833 (Ga. 1999) (citation omitted). FSA argues that it has standing as a subrogee under both varieties of subrogation because: (1) It was obligated by contract to make interest and principal payments on the bonds, and it alleged that it is doing so; and (2) the insurance policy expressly states that upon disbursement, FSA becomes "fully subrogated to the rights of the [bondholder]."

Stephens does not dispute that, had FSA properly pleaded a subrogation claim, it might be entitled to standing.[2] Stephens argues, however, that FSA cannot recover because it failed to allege every element of a bondholder claim, as it must according to Georgia law. See, e.g., S. Nitrogen Co. v. Stevens Shipping Co., 151 S.E.2d 916, 921 (Ga. 1966) (holding that, when proceeding upon the theory of conventional subrogation, it is essential that a plaintiff "allege facts showing the existence of a cause of action on the part of [the subrogor] against the defendant").

Because we have held that FSA has standing to bring a Rule 10b-5 claim as a purchaser of the bonds, we need not consider whether FSA adequately pled a subrogation claim and, if so, whether it has standing as a subrogee.

B. Statute of Limitations and Due Diligence

Stephens argues that, regardless of whether FSA has standing, FSA's Rule

_____

[2] The Bond Market Association asserts that there is no automatic subrogation to Rule 10b-5 rights. However, the Association fails to cite any controlling authority to that effect. Instead, the Association cites three district court opinions, two of which are unpublished, from outside of this circuit.

20

10b-5 claim is time-barred. Rule 10b-5 suits "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). The limitations period begins to run when the plaintiff has inquiry or actual notice of the alleged fraud. Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1283 (11th Cir. 2005) (citation omitted). FSA asserts that the parties entered into a tolling agreement on March 29, 2000, which expressly provided that already expired claims were not revived. Accordingly, FSA's Rule 10b-5 action is timely unless Stephens can establish that FSA had inquiry notice of the fraud prior to March 29, 1999. See Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1341 (N.D. Ga. 1998) (defendant bears the burdens of production and persuasion on a statute of limitations defense).

In Tello, a Rule 10b-5 case, this court adopted the position that to provide a potential plaintiff with inquiry notice, the facts known by that party must be

> sufficiently probative of fraud--sufficiently established beyond the stage of mere suspicion, sufficiently confirmed or substantiated--not only to incite the victim to investigate but also enable him to tie up any loose ends and complete the investigation in time to file a timely suit.

Id. at 1284-88 (Fujisawa Pharmaceutical Co., Ltd. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997)). Furthermore, "[t]he determination of when inquiry notice

21

occurred and <u>how much</u> investigation is reasonable for filing suit are necessarily fact-specific to each case, [and] accordingly . . . questions of notice and due diligence are particularly suited to a jury's consideration." <u>Id.</u> at 1284 (citations omitted; emphasis in original). Consequently, "[d]ismissal under Federal Rule of Civil Procedure 12(b)(6) 'on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred.'" <u>Tello</u>, 410 F.3d at 1288 (citations omitted). This is particularly the case where, as here, the plaintiff must plead with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. <u>See, e.g.</u>, <u>Marks v. CDW Computer Ctrs., Inc.</u>, 122 F.3d 363, 369 (7th Cir. 1997).

Because we agree with the district court that issues of material fact exist as to precisely what information was known to FSA on March 29, 1999 and whether that information was sufficient to provide FSA with inquiry notice, we cannot conclude at this stage of the proceedings that FSA's Rule 10b-5 claim is time-barred.

Finally, Stephens contends that FSA's failure to perform due diligence bars it from bringing a Rule 10b-5 action. In this circuit, plaintiffs bringing 10b-5 claims must establish "the justifiability of [their] reliance, frequently translated into a requirement of due diligence by the plaintiff." <u>Dupuy v. Dupuy</u>, 551 F.2d 1005,

22

1014 (5th Cir. 1972).[3]  The due diligence burden that applies in Rule 10b-5 actions is not identical to the burden imposed by Georgia law in fraud and negligent misrepresentation cases, and whether FSA performed sufficient due diligence to satisfy this burden cannot be resolved on a motion to dismiss.  We therefore leave this issue for the district court.

C. State Law Fraud and Negligent Misrepresentation Claims

The district court granted summary judgment in favor of Stephens and Hayes James on FSA's common law fraud and negligent misrepresentation claims, holding that: (1) Stephens and Hayes James did not owe FSA a duty to disclose, (2) the alleged misrepresentations were not actionable, and (3) FSA did not justifiably rely on any alleged misrepresentations because it failed to exercise due diligence as a matter of law.

We review the district court's grant of summary judgment de novo, drawing all inferences in favor of the non-moving party. Korman v. HBC Fla., Inc., 182 F.3d 1291, 1293 (11th Cir. 1999).

Under Georgia law, a plaintiff alleging fraud must demonstrate: (1) a false representation by the defendant, (2) the defendant's knowledge that the

---

[3] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

23

information is false (scienter), (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff. See, e.g., Avery v. Chrysler Motors Corp., 448 S.E.2d 737, 739 (Ga. Ct. App. 1994). To prove negligent misrepresentation, a plaintiff must establish: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." See Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 479 S.E.2d 727, 729 (Ga. 1997). In advancing either claim, therefore, a plaintiff must establish that the defendant made false representations, on which the plaintiff justifiably relied.

### i. Claims Against Hayes James

FSA argues that it justifiably relied on both Hayes James's BCL and the description of Hayes James's Acceptance Test contained in the RFP. To establish reasonable reliance under Georgia law as to either fraud or negligent misrepresentation, a plaintiff must show that it exercised due diligence. White v. BDO Seidman, LLP, 549 S.E.2d 490, 494 (Ga. Ct. App. 2001) (negligent misrepresentation); Bogle v. Bragg,, 548 S.E.2d 396, 400-01 (Ga. Ct. App. 2001) (fraud). Georgia law places a significant due diligence burden on sophisticated

24

parties engaged in arms-length transactions, such as the bond transaction at issue here. See, e.g., William Goldberg & Co. v. Cohen,, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995). Although questions of due diligence are generally for the jury to decide, a court can find that a party has failed to exercise due diligence as a matter of law where due diligence failures are particularly egregious. See, e.g., Wender & Roberts, Inc. v. Wender, 518 S.E.2d 154, 159 (Ga. Ct. App. 1999).

Because FSA failed to put forth any evidence that any of its employees had actually read the Hayes James BCL,[4] we agree with the district court that FSA cannot prove that it justifiably relied on any alleged misrepresentation or omission in that document.

Likewise, we find that FSA did not justifiably rely on any alleged misrepresentation contained in the description of the Acceptance Test found in the RFP. FSA failed to perform any due diligence with respect to the Acceptance Test. FSA did not ask Hayes James or Stephens any questions regarding the Acceptance Test and did not even inquire as to whether the Facility passed the test. Nor did FSA request a copy of the report prepared in connection with the Acceptance Test. Accordingly, we hold as a matter of law that FSA failed to meet its due diligence

---

[4] Ron Millet, FSA's in-house counsel, stated in an affidavit that he "relied on [the BCL] to the extent that [he] knew FSA required its receipt prior to the bond closing." That statement does not help FSA, however. Because Millet did not rely on the contents of the BCL, he could not have relied on any alleged misrepresentations contained therein.

burden, both with respect to the BCL and the description of the Acceptance Test contained in the RFP. Because we hold that FSA failed to exercise due diligence with respect to either of the above documents, we need not consider whether Hayes James owed FSA a duty to disclose or whether Hayes James's alleged misrepresentations were actionable.

### ii. Claims Against Stephens

FSA claims that Stephens committed fraud and made negligent misrepresentations under Georgia law in four documents: the RFP, the POS, the OS, and the BCL. Because we have already held that FSA did not justifiably rely on the BCL, we will address only the alleged misrepresentations and omissions in the remaining three documents.[5]

As an initial matter, we note that the district court excluded the evidence offered by FSA regarding due diligence standards in the bond insurance industry. As FSA has not appealed that ruling, we do not consider the testimony of FSA's experts regarding those standards.

Regardless of whether the RFP, the POS and the OS contained material misrepresentations, FSA cannot prevail on its fraud and negligent

---

[5] The district court ruled that FSA failed to introduce competent evidence that anyone at FSA read the OS. However, in light of FSA's argument that in reviewing drafts of the POS, Millet effectively reviewed the OS (which is dated as of the closing date), we will assume for purposes of this appeal that Millet reviewed both the POS and the OS.

26

misrepresentation claims due to its abject failure to satisfy its due diligence burden.[6] FSA failed to perform any due diligence regarding the tonnage figures in the RFP, the POS and the OS, instead relying entirely on Stephens's representations. FSA could have discovered the discrepancies in tonnage figures that it now cites had it requested tonnage reports for the months preceding the Bond Closing. In addition, Gifford could have contacted the Authority, TransWaste or the Participants to confirm the actual tonnage figures. Furthermore, Stephens notes that some of the information that FSA received, including quotations in articles accompanying the RFP to the effect that the Facility would require 1,250 tons of waste per day to break even, should have prompted FSA to investigate further. In fact, FSA failed to seek any information regarding the Facility's performance in the months leading up to the Bond Closing. Had it done so, it could have discovered the alleged misrepresentations relating to the Facility's MOV recovery rates and its operational problems.

Most importantly, perhaps, FSA failed to perform any due diligence relating to TransWaste. Gifford identified the Participants' put or pay contracts as the

---

[6] FSA argues that the question of whether a party justifiably relied on alleged misrepresentations "should not be decided on summary judgment if there is any evidence showing the person exercised due diligence." Potts v. UAP-GA AG CHEM, Inc., 567 S.E.2d 316, 320 (Ga. Ct. App. 2002) (citations omitted; emphasis added). However, Potts did not involve sophisticated parties engaged in an arms-length transaction. See id. Georgia law imposes a much heavier due diligence burden on parties like FSA. See, e.g., William Goldberg & Co. v. Cohen, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995).

ultimate security for the bonds, but she failed to recognize the importance of TransWaste's contribution to the success of the Facility. TransWaste was responsible for a significant portion of the Facility's revenue, yet Gifford failed to discuss the Facility with TransWaste, inquire into TransWaste's financial wherewithal (to assess its ability to meet its performance guaranty) or, for that matter, review its contract. We hold that this due diligence failure was so egregious that FSA could not have reasonably relied on any representation relating to TransWaste.

We therefore agree with the district court that the facts regarding FSA's due diligence efforts, taken together, failed to create a triable issue of fact as to whether FSA justifiably relied on Stephens's representations. Because we hold that FSA did not reasonably rely on any of the alleged misstatements or omissions made by Stephens, we need not consider whether, and to what extent, Stephens owed FSA a duty of disclosure or whether its alleged misrepresentations were actionable.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on FSA's state law claims, but we REVERSE the dismissal of FSA's federal securities claim. We REMAND this case to the district court for further proceedings consistent with this opinion.