[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 18, 2007
THOMAS K. KAHN
CLERK

_____

No. 04-14894

_____

D. C. Docket No. 00-03181-CV-JOF-1

FINANCIAL SECURITY ASSURANCE, INC.,

Plaintiff-Appellant,

versus

STEPHENS, INC.,
HAYES, JAMES & ASSOCIATES, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 18, 2007)

**ON PETITION FOR REHEARING**

Before TJOFLAT and KRAVITCH, Circuit Judges, and LAWSON,[*] District
Judge.

_____

[*] Honorable Hugh Lawson, United States District Judge for the Middle District of
Georgia, sitting by designation.

PER CURIAM:

Stephens, Inc.'s ("Stephens") petition for panel rehearing is **GRANTED**. We **VACATE** our prior opinion in this case, 450 F.3d 1257 (11th Cir. 2006), and substitute the following in its place.

## I.

The plaintiff, Financial Security Assurance, Inc. ("FSA"), appeals the district court's orders dismissing its Rule 10b-5 claim and granting summary judgment in favor of defendants Stephens and Hayes, James & Associates, Inc. ("Hayes James") on its claims for common law fraud and negligent misrepresentation. The primary issue presented in this case is whether an insurer of municipal bonds that becomes the owner of those bonds upon default has standing pursuant to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. We conclude that, under the facts of this case, they do not. After thorough review, we affirm the district court's dismissal of the Rule 10b-5 claim and grant of summary judgment on the fraud and negligent misrepresentation claims.

## II. Facts

In the early 1990s, Crisp County, Georgia approved plans for a regional

solid waste processing facility (the "Facility"), which would extend the life of a newly-opened landfill by removing recyclable material from waste before dumping the remainder into the landfill. The County established the Solid Waste Management Authority of Crisp County (the "Authority") to construct and operate the Facility. To finance its initial construction, the Authority obtained approximately $53 million in short-term bank loans in 1996 (the "Bank Financing").

Once constructed, the Authority would obtain revenue for the Facility by accepting waste from cities, counties and private companies and by selling materials of value ("MOV") from the waste it collected. Accordingly, before the Facility was built, the Authority contracted with more than thirty of these entities (the "Participants"), each of which agreed to make minimum payments to the Authority based on the expected tonnage of waste the Authority would collect or the number of households the Authority would service in the city or county. They executed "put or pay" contracts. The Authority also contracted with TransWaste Services LLC ("TransWaste"), a waste hauler, to pick up the Participants' waste and deliver it to the Facility, paying a tipping fee for each ton delivered. TransWaste agreed to deliver enough waste for the Authority to break even. In turn, the Authority agreed that TransWaste would receive a rebate from the

Authority's revenues from the sale of recyclable MOV.

The Authority contracted with defendant Hayes James for civil engineering services, including the conduct of a feasibility study based on the Bank Financing and the preparation of a report on the results of an Acceptance Test that Hayes James had developed for the Facility's equipment.

The Authority hired Stephens to act as underwriter for a bond financing for the Facility. In early 1998, Stephens prepared a Request for Proposal ("RFP") for potential credit enhancers, including FSA. The RFP included a pro forma financial representation (the "Pro Forma"). The RFP's disclaimer instructed potential credit enhancers to perform their own due diligence.

FSA assigned one of its employees, Margaret Gifford, to analyze the RFP and make a recommendation as to whether FSA should insure the bonds. Gifford toured the Facility and obtained information about the equipment, the quantities of waste delivered and processed, and the amount of MOV recovered. She recommended that FSA insure the bonds. Gifford's report noted that the Authority's contracts were the ultimate security for the bond issue. She reviewed only one sample contract between the Authority and a Participant, however, and she did not request copies of the contracts with TransWaste or with Crisp County. Gifford testified in her deposition that she did not perform any due diligence after

4

July 28, 1998.

FSA submitted a bid in late July 1998, which was later accepted. The bid was conditioned on full review of all legal documentation pertaining to the deal.

The RFP indicated that the Facility would be subjected to an Acceptance Test to ensure that the Facility met its design specifications. Hayes James supplied the Acceptance Test's design specifications for inclusion in the RFP, based on the original contract created in connection with the Bank Financing. Hayes James made a few minor changes to these specifications and then provided them to Stephens for inclusion in the RFP. The Acceptance Test was administered after FSA agreed to insure the bonds. FSA never requested a copy of the test results, nor did it inquire as to how the Facility performed.

After Stephens accepted FSA's bid, Stephens's counsel prepared a Preliminary Official Statement (the "POS") for the Authority. Though her duties were officially finished by that point, Gifford testified that she did "glance at" the POS when it was provided to FSA. Ron Millet, in-house counsel for FSA, also testified that he read and made suggestions regarding at least one draft of the POS.

In October 1998, at the request of TransWaste, the Authority and TransWaste executed an amendment to their contract. The amendment extended the period for which TransWaste was eligible for its rebate based on MOV receipts

and delayed enforcement of the break-even guarantee requirement. Stephens did not notify FSA of this amendment or the conversations that led to it. Also in October, Stephens, Hayes James, and the Authority prepared a first-year budget for the Authority, which was sent to FSA. Hayes James also provided a budget certification letter (the "BCL"), certifying that the budget was reasonable.

The bond transaction closed on November 12, 1998 (the "Bond Closing"). The final version of the Official Statement (the "OS") was delivered to FSA just prior to the closing. Within two months of the Bond Closing, the Authority informed FSA that it was revising its budget and cash flow analysis. FSA terminated Gifford's employment shortly thereafter, based in part on her performance in this transaction. The Authority and TransWaste then further amended their contract by reducing the tipping fee and relieving TransWaste of its tonnage guarantee. Eventually, the Authority exhausted its debt service reserve fund and was unable to continue making payments on the bonds.

In anticipation of litigation, the parties to this action entered into a tolling agreement on March 29, 2000. On December 1, 2000, FSA brought the present action in the United States District Court for the Northern District of Georgia, alleging federal securities fraud under Rule 10b-5 against Stephens and state law claims for fraud and negligent misrepresentation against both Stephens and Hayes

6

James. The district court later granted Stephens's Rule 12(b)(6) motion to dismiss the federal securities claim. After a period of discovery, the defendants moved for summary judgment on the state law claims, which the district court granted, based primarily on FSA's failure to meet the due diligence requirements for justifiable reliance under Georgia law. FSA then filed the instant appeal.

### III. Discussion

A. 10b-5 Standing

The district court dismissed FSA's Rule 10b-5 claim on the ground that FSA was not a purchaser or seller of securities as required by the Rule's authorizing statute, § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and thus lacked standing to bring the claim.

We review de novo a district court's dismissal of a complaint for failure to state a claim upon which relief could be granted, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. Roberts v. Fla. Power & Light Co., 146 F.3d 1305, 1307 (11th Cir. 1998). Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "The threshold of sufficiency that a complaint must meet to survive a

motion to dismiss for failure to state a claim is, as we have stated previously, 'exceedingly low.'"  Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 703 (11th Cir. 1985) (citing Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev., 711 F.2d 989, 995 (11th Cir. 1983)). That said, "while notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001) (quoting In re Plywood Antitrust Litig., 655 F.2d 627, 641 (5th Cir. Unit A Sept. 8, 1981)).

In Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the Supreme Court endorsed the standing rule created by Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2d Cir. 1952), which permits only purchasers and sellers of securities, and those with contracts to purchase and sell securities, to bring suit under Rule 10b-5.  The Blue Chip Stamps Court noted that three principal categories of plaintiffs are excluded from standing: (1) "potential purchasers of shares . . . who allege that they decided not to purchase because of" the alleged violations; (2) "actual shareholders in the issuer who allege that they decided not to sell their shares because of" the alleged violations; and (3) "shareholders, creditors,

8

and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5." Blue Chip Stamps, 421 U.S. at 737-38. Stephens contends that FSA is thus excluded.

FSA contends that it has standing on four independent grounds: (1) as the true party at risk in this transaction, it was effectively the purchaser of the bonds; (2) it is entitled to standing as a guarantor of the bonds; (3) it actually purchased the securities pursuant to the terms of the insurance policy; and (4) it is fully subrogated to the rights of the individual bondholders and therefore entitled to bring suit based on their purchases.

i. Party At Risk

FSA suggests that as the true "party at risk" in the bond transaction, it should have standing to assert a claim under Rule 10b-5. That is, FSA argues that it satisfies the purchaser-seller requirement set forth in Birnbaum and endorsed by the Supreme Court in Blue Chip Stamps, because, as the insurer of the bonds, it bore the risk that a purchaser would ordinarily bear. FSA is mistaken, however, in interpreting the purchaser-seller requirement to entail a functional, and not a formal, inquiry. Although the Supreme Court discussed the functional aspects of the rule in its reasoning, the Court deliberately endorsed a standing rule that would

not be subject to "endless case-by-case erosion" by courts employing a functional analysis to every new group of potential plaintiffs. See Blue Chip Stamps, 421 U.S. at 755. Accordingly, FSA's assumption of risk in the bond transaction does not provide it with Rule 10b-5 standing.

ii. Guarantor Standing

FSA argues that it also has standing as a guarantor of the bonds. FSA first contends that it has standing as a guarantor because a guarantor qualifies as a purchaser of securities. This is not so. Granting standing to a guarantor as a purchaser would contravene the rule that this court announced in Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550 (11th Cir. 1989), that, consistent with Blue Chip Stamps, a plaintiff must have actually purchased or sold, or entered into an enforceable contract to purchase or sell, securities to have standing under Rule 10b-5. Id. at 1554-55.

FSA next advances the novel theory that, in insuring the bonds, it sold a security, that is, a guaranty. This argument fails because a guaranty does not qualify as a security for Rule 10b-5 purposes. Section 3(a)(10) of the Exchange Act defines a "security" as follows:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription,

10

transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt of, or warrant or right to subscribe to or purchase, any of the foregoing . . . .

15 U.S.C.A. § 78c(a)(10).  As the foregoing definition does not include a guaranty,

FSA lacks standing as a guarantor of the bonds.

### iii. Contract to Otherwise Acquire the Bonds

FSA further argues that its insurance policy constitutes a contract to

purchase the Bonds, qualifying FSA as a purchaser pursuant to Blue Chip Stamps.

Notably, § 3(a)(13) of the Exchange Act defines the term "purchase" to include

"any contract to buy, purchase, or otherwise acquire" securities. See 15 U.S.C.

§ 78c(a)(13) (emphasis added).   The policy provides that

> [u]pon disbursement in respect of a Bond, [FSA] shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the bond  and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by [FSA] hereunder.

Accordingly, FSA contends that it acquired a contingent interest in the bonds

because the policy constitutes a contract to otherwise acquire them upon the

occurrence of a specified contingent event, that is, default.

Stephens counters that FSA failed to allege a crucial element of a Rule 10b-5

action in its complaint — that it had purchased or sold a security.  As Stephens

11

notes, FSA did not specifically allege that it had entered into a contract to acquire the bonds. Nor did FSA attach the insurance policy or quote relevant terms of the policy in its complaint. Indeed, on reading the allegations in FSA's complaint, one could understand FSA to be advancing a theory of standing based solely on the fact that it suffered economic harm as a result of the defendant's alleged fraud, a basis that was rejected in Blue Chip Stamps.

Ordinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir. 1997). This court recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss. Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999); Brooks, 116 F.3d at 1368-69. Here, FSA refers to the existence of the insurance policy and relies on the effect of the policy — that FSA is thereby required to make payments to the bondholders — though it does not quote from the policy or discuss its specific provisions. The question, then, is whether the policy is nevertheless "central" to FSA's federal securities claim.

In considering this question, the First Circuit has held, with respect to a

complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's motion to dismiss was central to the plaintiffs' claim because "Plaintiffs unquestionably would have had to offer a copy of the article in order to prove their case." Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988). According to that standard — whether the plaintiff would have had to offer the document in order to prove its case — the policy would appear to be central to FSA's claim, for FSA would ultimately have to offer a copy of the policy to prevail under any conceivable theory of its case.

This case, however, presents a closer question than most cases in which this issue arises. The potential harm that courts are mindful of in these situations is the lack of notice that the attached document may be considered by the court. See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("[G]enerally, the harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Because Stephens attached the policy to its motion to dismiss, we cannot find that Stephens lacked notice that the district court or this court might consider the document. Accordingly, we will consider the policy appended to Stephens's motion to dismiss as part of the pleadings because it is referred to in the complaint, it is central to FSA's federal securities claim, its consideration comports with the requirements of

13

notice pleading, and neither party challenges its authenticity.

Even considering the insurance policy, we conclude that FSA did not "otherwise acquire" a "security," and, therefore, FSA does not have standing to bring a claim under Rule 10b-5. Although by the insurance policy's own terms FSA acquired the bonds upon default by the Authority, we conclude that at the time of such transfer the instruments FSA acquired were no longer "securities" as required for standing under Rule 10b-5.

"[T]o reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a 'security' as defined in [the] 1934 Act[]." Home Guaranty Ins. Corp. v. Third Fin. Servs., Inc. 667 F. Supp. 577, 579 (M.D. Tenn. 1987). The Supreme Court has articulated three tests to determine whether an instrument is a "security" that is protected under the federal securities laws by means of being an "investment contract," "stock," or "note." First, an instrument is an "investment contract" if it "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." SEC v. W.J. Howey Co., 328 U.S. 293, 301, 66 S. Ct. 1100, 1104 (1946). Second, the characteristics typically associated with "stock" are that it grants "the right to receive dividends contingent upon an apportionment of profits"; is negotiable; grants "the ability to be pledged or hypothecated";

14

"confer[s] [] voting rights in proportion to the number of shares owned"; and has "the capacity to appreciate in value." Landreth v. Landreth Timber Co., 471 U.S. 681, 686, 105 S. Ct. 2297, 2302 (1985). Third, the factors to consider when determining if an instrument is a "note" are whether "the buyer is interested primarily in the profit the note is expected to generate[,] . . . it is an instrument in which there is 'common trading for speculation or investment,'" the investing public reasonably expects the instrument to be a note, and no other "regulatory scheme significantly reduces the risk of the instrument." Reves v. Ernst & Young, 494 U.S. 56, 66-67, 110 S. Ct. 945, 949 (1990).

In this case, the very terms of the insurance policy and the OS regarding the revenue bonds explain why we conclude that FSA did not otherwise acquire a "security." Under the insurance policy, FSA was obligated to disburse "that portion of the principal of an interest on the Bonds that shall be Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer."[1] Once FSA disbursed the amount due for payment because of the Authority's non-payment, the insurance agreement specified that FSA became "owner of the Bond, any appurtenant coupon

---

[1] Under the insurance policy, "Due for Payment" means "(a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity . . . and (b) when referring to interest on a Bond, payable on the stated date for payment of interest."

15

to the Bond or right to receipt of payment of principal of or interest on the Bond

. . . to the extent of any payment by Financial Security hereunder."  According to

FSA, this transfer of the bonds satisfied Rule 10b-5's requirement that they

"otherwise acquired" a "security" through the insurance contract.  We do not

disagree that FSA acquired the bonds through operation of the insurance policy.

However, although FSA became the "owner" of the bonds, it did not acquire a

"security" because, by the OS's own terms, FSA acquired no right to receive

interest or principal in the bonds after disbursement.[2]  Under the OS, once the

bonds or a portion of the bonds were redeemed, the owners of such bonds or

portions thereof ceased to be entitled to any benefit or security under the Bond

Resolution.

> On the date so designated for redemption . . . Series 1998 Bonds or
> portions of Series 1998 Bonds so called for redemption will become

---

[2] This case is distinguishable from those in which a bank accepts securities as collateral for a loan, because here, FSA cannot recover monies from the "bonds" once acquired.  See Rubin v. United States, 449 U.S. 424, 429-31 (1981) (holding that pledging securities as collateral for a loan constitutes an "offer or sale" under § 17(a) of the Securities Act); Marine Bank v. Weaver, 455 U.S. 551, 554 n.2 (1982) (indicating, in a Rule 10b-5 case, that Rubin resolved the circuit split over whether "a pledge of stock is equivalent to a sale for the purposes of the antifraud provisions of the federal securities laws" and making no distinction between the Securities Act and the Exchange Act for these purposes).  Although both FSA and a bank using securities as collateral are impacted by default, the bank is relying on the value of the securities to recover some of their loss.  And although it may be true that occasionally a bank will recover nothing from the collateral because the securities have lost all of their value, the bank did not enter into the contract assuming such.  Here, when FSA entered into the insurance contract, the terms were clear regarding the lack of value of the bonds after disbursement.  As such, it cannot be said that FSA entered into the insurance contract assuming it could recover some of its losses from a default through liquidation of the bonds it had acquired.

16

and be due and payable at the Redemption Price provided for redemption of such Series 1998 Bonds or portions thereof on such date and . . . such Bonds or portions thereof will cease to be entitled to any benefit or security under the Resolution and the Owners of such Bonds or portions thereof will have no rights in respect thereof except to receive payment of the Redemption Price thereof and the accrued interest and to the extent provided in the Resolution, and to receive Series 1998 Bonds for any unredeemed portions of Series 1998 Bonds.

As such, after FSA acquired the bonds it had no right to past payments of principal and interest because the obligation to pay those portions of the bond had been discharged by FSA's disbursement of the amount that was "due for payment."

Furthermore, FSA had no right to future payments. First, FSA owned the bonds only "to the extent of any payment" by FSA, and FSA has not disbursed future payments. Second, as the bonds for which disbursement had been made by FSA were no longer entitled to "any benefit or security under the Resolution" and the new owner, FSA, had no "rights in respect thereof," FSA was not entitled to any future payments on the bonds.

The "bonds" that FSA acquired at default, therefore, were not "securities" because they failed to satisfy the definitions of either an "investment contract," "stock," or "note" as articulated by the Supreme Court. First, the "bonds" were not an "investment contract" because FSA did not acquire any "profit to come solely from the efforts of others" through the "bonds." W.J. Howey Co., 328 U.S. at 301.

17

FSA's profit in this transaction came from the consideration paid by the Authority for the issuance of the insurance policy, not from the bonds issued by the Authority. Second, the "bonds" were not "stocks" because they did not confer the right to vote or receive dividends and were not negotiable or transferable. Landreth Timber Co., 471 U.S. at 686. Third, the "bonds" were not "notes" because FSA was not "interested primarily in the profit the note is expected to generate." Reves, 494 U.S. at 66-67. As discussed above, it does not appear that the bond had the potential to generate any profit for FSA because FSA discharged the debt obligations. Furthermore, FSA issued the policy in return for consideration from the Authority, not to invest in the bonds. Although "most instruments bearing [] a traditional title are likely to be covered by the definition [of a security] . . . the label . . . is not of itself sufficient to invoke the coverage of the Acts." Landreth Timber Co., 471 U.S. at 686. Rather, the "economic realities" of the instrument actually conveyed ultimately govern whether the insurance contract is a security. Reves, 494 U.S. at 62. Because the "bonds" that FSA acquired under the insurance policy were not "securities" within the meaning of the Exchange Act, 15 U.S.C. § 78c(a)(1), the "bonds" did not confer standing for FSA to allege a violation of Rule 10b-5.

18

iv. Subrogation

Finally, FSA argues that it has standing based on subrogation. "Subrogation is '[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.'" Jones Motor Co. v. Anderson, 602 S.E.2d 228, 230 (2004) (quoting Black's Law Dictionary 1427 (6th ed. 1990)); see also Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-37 (1962). Subrogation is either "legal" or "conventional." Legal subrogation is an equitable doctrine and arises by operation of the law without any agreement to that effect between the parties; conventional subrogation rests on contract, arising where "an agreement is made that the person paying the debt shall be subrogated to the rights and remedies of the original creditor." Gilbert v. Dunn, 128 S.E.2d 739, 740 (Ga. 1962) (citation omitted); see also State Farm Mut. Auto. Ins. Co. v. Cox, 515 S.E.2d 832, 833 (Ga. 1999). FSA argues that it has standing as a subrogee under both varieties of subrogation because: (1) it was obligated by contract to make interest and principal payments on the bonds, and it alleged that it was doing so; and (2) the insurance policy expressly stated that upon disbursement, FSA becomes "fully subrogated to the rights of the [bondholder]."

Stephens does not dispute that had FSA properly pleaded a subrogation

19

claim, it might be entitled to standing.[3]  Stephens argues, however, that FSA cannot

recover under this theory because it failed to allege every element of a bondholder

claim, as it must according to Georgia law.  See, e.g., S. Nitrogen Co. v. Stevens

Shipping Co., 151 S.E.2d 916, 921 (Ga. 1966) (holding that, when proceeding

upon the theory of conventional subrogation, it is essential that a plaintiff "allege

facts showing the existence of a cause of action on the part of [the subrogor]

against the defendant").

It appears clear that the bondholders in this case would have standing to

bring a claim under Rule 10b-5, as they were the actual purchasers of the bonds.  In

its complaint, however, FSA failed to allege harm to the bondholders caused by the

misrepresentations of Stephens.  Instead, FSA alleged that Stephens "deceive[d]

FSA" and "made material misrepresentations . . . for the purpose and effect of

inducing FSA to insure the Bonds issued by the Authority."  FSA goes on to allege

that, as a result, "FSA could not properly assess the risk factors associated with

insuring the Bonds."  As a subrogee, FSA cannot file a complaint based on the

harm it suffered itself.  See Liberty Nat'l Ins. Holding Co. v. Charter Co., 734 F.2d

545, 554 (11th Cir. 1984).  We conclude, therefore, that FSA did not have standing

_____

[3] Amicus, the Bond Market Association asserts that there is no automatic subrogation to Rule 10b-5 rights.  However, the Association fails to cite any controlling authority to that effect. Instead, the Association cites three district court opinions, two of which are unpublished, from outside of this circuit.

to bring a claim under Rule 10b-5 for harms it suffered, rather than harm suffered by the bondholders, under the theory of subrogation.

B. Statute of Limitations and Due Diligence

Stephens argues that, regardless of whether FSA has standing, FSA's Rule 10b-5 claim is time-barred and FSA's failure to perform due diligence bars it from bringing a Rule 10b-5 action. As we have already concluded that FSA lacks standing to bring a claim under Rule 10b-5, we need not address these issues.

C. State Law Fraud and Negligent Misrepresentation Claims

The district court granted summary judgment in favor of Stephens and Hayes James on FSA's common law fraud and negligent misrepresentation claims, holding that: (1) Stephens and Hayes James did not owe FSA a duty to disclose, (2) the alleged misrepresentations were not actionable, and (3) FSA did not justifiably rely on any alleged misrepresentations because it failed to exercise due diligence as a matter of law.

We review the district court's grant of summary judgment <u>de novo</u>, drawing all inferences in favor of the non-moving party. <u>Korman v. HBC Fla., Inc.</u>, 182 F.3d 1291, 1293 (11th Cir. 1999).

Under Georgia law, a plaintiff alleging fraud must demonstrate: (1) a false representation by the defendant, (2) the defendant's knowledge that the

21

information is false (scienter), (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff.  See, e.g., Avery v. Chrysler Motors Corp., 448 S.E.2d 737, 739 (Ga. Ct. App. 1994).  To prove negligent misrepresentation, a plaintiff must establish: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." See Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 479 S.E.2d 727, 729 (Ga. 1997).  In advancing either claim, therefore, a plaintiff must establish that the defendant made false representations on which the plaintiff justifiably relied.

i. Claims Against Hayes James

FSA argues that it justifiably relied on both Hayes James's BCL and the description of Hayes James's Acceptance Test contained in the RFP.  To establish reasonable reliance under Georgia law as to either fraud or negligent misrepresentation, a plaintiff must show that it exercised due diligence.  White v. BDO Seidman, LLP, 549 S.E.2d 490, 494 (Ga. Ct. App. 2001) (negligent misrepresentation); Bogle v. Bragg, 548 S.E.2d 396, 400-01 (Ga. Ct. App. 2001) (fraud).  Georgia law places a significant due diligence burden on sophisticated

22

parties engaged in arms-length transactions, such as the bond transaction at issue here.  See, e.g., William Goldberg & Co. v. Cohen, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995).  Although questions of due diligence are generally for the jury to decide, a court can find that a party has failed to exercise due diligence as a matter of law where due diligence failures are particularly egregious.  See, e.g., Wender & Roberts, Inc. v. Wender, 518 S.E.2d 154, 159 (Ga. Ct. App. 1999).

Because FSA failed to put forth any evidence that any of its employees had actually read the Hayes James BCL,[4] we agree with the district court that FSA cannot prove that it justifiably relied on any alleged misrepresentation or omission in that document.

Likewise, we find that FSA did not justifiably rely on any alleged misrepresentation contained in the description of the Acceptance Test found in the RFP.  FSA failed to perform any due diligence with respect to the Acceptance Test.  FSA did not ask Hayes James or Stephens any questions regarding the Acceptance Test and did not even inquire as to whether the Facility passed the test.  Nor did FSA request a copy of the report prepared in connection with the Acceptance Test.  Accordingly, we hold as a matter of law that FSA failed to meet its due diligence

---

[4] Ron Millet, FSA's in-house counsel, stated in an affidavit that he "relied on [the BCL] to the extent that [he] knew FSA required its receipt prior to the bond closing."  That statement, however, does not help FSA.  Because Millet did not rely on the contents of the BCL, he could not have relied on any alleged misrepresentations contained therein.

23

burden, both with respect to the BCL and the description of the Acceptance Test contained in the RFP. Because we conclude that FSA failed to exercise due diligence with respect to either of the above documents, we need not consider whether Hayes James owed FSA a duty to disclose or whether Hayes James's alleged misrepresentations were actionable.

### ii. Claims Against Stephens

FSA claims that Stephens committed fraud and made negligent misrepresentations under Georgia law in four documents: the RFP, the POS, the OS, and the BCL. Because we have already held that FSA did not justifiably rely on the BCL, we will address only the alleged misrepresentations and omissions in the remaining three documents.[5]

As an initial matter, we note that the district court excluded the evidence offered by FSA regarding due diligence standards in the bond insurance industry. As FSA has not appealed that ruling, we do not consider the testimony of FSA's experts regarding those standards.

Regardless of whether the RFP, the POS, and the OS contained material misrepresentations, FSA cannot prevail on its fraud and negligent

---

[5] The district court ruled that FSA failed to introduce competent evidence that anyone at FSA read the OS. However, in light of FSA's argument that in reviewing drafts of the POS, Millet effectively reviewed the OS (which is dated as of the closing date), we will assume for purposes of this appeal that Millet reviewed both the POS and the OS.

24

misrepresentation claims due to its abject failure to satisfy its due diligence burden.[6]  FSA failed to perform any due diligence regarding the tonnage figures in the RFP, the POS, and the OS, instead relying entirely on Stephens's representations.  FSA could have discovered the discrepancies in tonnage figures that it now cites had it requested tonnage reports for the months preceding the Bond Closing.  In addition, Gifford could have contacted the Authority, TransWaste or the Participants to confirm the actual tonnage figures.  Furthermore, Stephens notes that some of the information that FSA received, including quotations in articles accompanying the RFP to the effect that the Facility would require 1,250 tons of waste per day to break even, should have prompted FSA to investigate further.  In fact, FSA failed to seek any information regarding the Facility's performance in the months leading up to the Bond Closing.  Had it done so, it could have discovered the alleged misrepresentations relating to the Facility's MOV recovery rates and its operational problems.

Most important, perhaps, FSA failed to perform any due diligence relating to TransWaste.  Gifford identified the Participants' put or pay contracts as the

_____

[6] FSA argues that the question of whether a party justifiably relied on alleged misrepresentations "should not be decided on summary judgment if there is any evidence showing the person exercised due diligence." Potts v. UAP-GA AG CHEM, Inc., 567 S.E.2d 316, 320 (Ga. Ct. App. 2002) (citations omitted; emphasis added).  However, Potts did not involve sophisticated parties engaged in an arms-length transaction. See id.  Georgia law imposes a much heavier due diligence burden on parties like FSA.  See, e.g., William Goldberg & Co. v. Cohen, 466 S.E.2d 872, 877 (Ga. Ct. App. 1995).

ultimate security for the bonds, but she failed to recognize the importance of TransWaste's contribution to the success of the Facility. TransWaste was responsible for a significant portion of the Facility's revenue, yet Gifford failed to discuss the Facility with TransWaste, inquire into TransWaste's financial wherewithal (to assess its ability to meet its performance guaranty) or, for that matter, review its contract. We hold that this due diligence failure was so egregious that FSA could not have reasonably relied on any representation relating to TransWaste.

We therefore agree with the district court that the facts regarding FSA's due diligence efforts, taken together, failed to create a triable issue of fact as to whether FSA justifiably relied on Stephens's representations. Because we hold that FSA did not reasonably rely on any of the alleged misstatements or omissions made by Stephens, we need not consider whether, and to what extent, Stephens owed FSA a duty of disclosure or whether its alleged misrepresentations were actionable.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment on FSA's state law claims and the dismissal of FSA's federal securities claim.