[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 21-10818
Non-Argument Calendar

_____

D.C. Docket No. 9:20-cv-80651-DMM

TERRY V. WOODS,

Plaintiff-Appellant,

versus

STEVEN MICHAEL,
ANDREW GREENBAUM,
et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 3, 2021)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Terry Woods appeals the Rule 12(b)(6) dismissal of his claims under the Racketeer Influenced and Corrupt Organizations Act (the "RICO Act") and under the Securities Act of 1933.  In his 299-parargraph complaint, Woods alleged that Steven Michael, Andrew Greenbaum, and their various companies repeatedly defrauded him in connection with a series of financial transactions that took place between April of 2014 and June of 2018.  The district court dismissed Woods' RICO claims because it found that the conduct alleged in the complaint, if true, amounted to securities fraud—and therefore any RICO claims were barred by the Private Securities Litigation Reform Act ("PSLRA"), which forecloses RICO liability for "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c).  The district court then went on to dismiss Woods' securities-fraud claims as untimely.  Finally, having dismissed all of Woods' federal claims on their merits, the district court declined to exercise supplemental jurisdiction over Woods' remaining claims under state law.

Woods raises three arguments on appeal.  First, he argues that the transactions in dispute did not involve "securities" as defined by the Securities Act, and therefore his RICO claims were not barred by the PSLRA.  Second, he argues that the district court erred in dismissing his securities-fraud claims as untimely because, in doing so, it improperly resolved the factual question of when

2

"reasonable diligence" would have uncovered the alleged fraud—which is an issue that he contends should have gone to a jury.  Third, he argues that the doctrine of equitable estoppel should have tolled the statute of limitations in this case.

For the following reasons, we affirm.

## I.    STANDARD OF REVIEW

We review *de novo* the dismissal of a civil complaint under Rule 12(b)(6). *Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013).  To survive a motion to dismiss, the complaint must contain enough factual allegations to set forth "a plausible entitlement to relief." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007).  At this stage of litigation, we accept all allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  *Id.*  However, the plaintiff cannot merely allege "labels and conclusions," but instead must plead sufficient facts to "raise a right to relief above the speculative level." *Id.*

## II.    DISCUSSION

### A. The RICO Claims

The RICO Act makes it unlawful for any person who has received income from "a pattern of racketeering activity"—whether directly or indirectly—to use that income "in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in . . . interstate or foreign commerce."  18 U.S.C.

3

§ 1962. Any person "injured in [his or her] business or property" by a violation of

the RICO Act may sue the violator in federal court and "shall recover threefold the

damages [he or she] sustains . . . <u>except</u> that no person may rely on any conduct

that would have been actionable as fraud in the purchase or sale of securities to

establish [a RICO violation]." *Id.* § 1964(c) (emphasis added).

The Securities Act of 1933 provides a private cause of action to victims of

securities fraud. It states:

> Any person who . . . offers or sells a security . . . by means of a prospectus
> or oral communication, which includes an untrue statement of a material
> fact or omits to state a material fact necessary in order to make the
> statements, in the light of the circumstances under which they were
> made, not misleading . . . shall be liable . . . to the person purchasing such
> security from [him or her].

15 U.S.C. § 77l(a). Thus, to state a securities-fraud claim, a plaintiff must

allege (1) a material misrepresentation or materially misleading omission,

(2) that the misrepresentation or misleading omission occurred in

connection with the offer or sale of a security, (3) scienter, (4) justifiable

reliance, (5) and damages. *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d

1233, 1244 (11th Cir. 2012).

The Act defines the term "security" to mean:

> [A]ny note, stock, treasury stock, security future, security-based swap,
> bond, debenture, evidence of indebtedness, certificate of interest or
> participation in any profit-sharing agreement, collateral-trust certificate,
> preorganization certificate or subscription, transferable share,
> investment contract, voting-trust certificate, certificate of deposit for a

4

security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).  Although this definition is extraordinarily broad on its face, the Supreme Court has held that "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts."  *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990).  "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called."  *Id.* at 61 (emphasis in original).  Thus, to determine whether a note qualifies as a "security," we must assess whether the underlying transaction was an investment.  In doing so, we consider four factors: (1) the motivations underlying the transaction, (2) the "plan of distribution" for the instrument, (3) the reasonable expectations of the investing public, and (4) whether there is another regulatory scheme—apart from the securities laws—minimizing the risk associated with the instrument.  *Id.* at 66-67.

Having reviewed the lengthy allegations of Woods' complaint, we conclude that the promissory notes at issue in this case were "securities."  When read in the

light most favorable to Woods, the complaint alleges that Michael and Greenbaum persuaded Woods—through various misrepresentations—to loan them $1,000,000 for the development of one of their properties. In exchange, they promised to repay the loan with 9% annual interest and to give Woods an equity share in the entity that owned the property. Shortly afterward, Michael and Greenbaum also convinced Woods to provide millions of dollars toward several of their other projects, on identical terms. When Michael and Greenbaum failed to fulfill their end of these agreements on time, they repeatedly promised Woods that they would repay him with additional interest and additional equity if he would forbear from filing a lawsuit. Those promises went unfulfilled as well, and this litigation eventually followed.

These transactions, in which Woods sought to finance another person's business ventures with the expectation receiving a share of the profits, were quintessential investments—and therefore the promissory notes offered to Woods by Michael and Greenbaum were "securities." A note is most likely to be a "security" where, as here, "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Id.* at 66. In this context, "profit" refers to any "valuable return on an investment," which includes interest. *Id.* at 67 n.4. Significantly, most of the notes at issue in this case

entitled Woods not only to interest on his loans, but also to ownership shares in the defendants' various properties. And so far as we can discern from Woods' allegations, those promises of profit through interest and equity were his sole motivations for supplying funds to the defendants. We therefore hold that the transactions described in Woods' complaint constituted sales of "securities."[1]

Accordingly, because a plaintiff may not rely on conduct "that would have been actionable as fraud in the purchase or sale of securities" to establish a violation of the RICO Act, the district court did not err in dismissing Woods' RICO claims.[2]

---

[1]     Woods argues that a subset of the notes at issue cannot be deemed "securities," even if they would otherwise qualify, because they fall within a statutory exception for notes with a maturity period of less than nine months. The Securities Exchange Act of 1934 states that the term "security" shall not include "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months." 15 U.S.C. § 78c. However, our precedent has interpreted this provision to apply only to "commercial paper," not "investment paper." *Bellah v. First Nat. Bank of Hereford, Tex.*, 495 F.2d 1109, 1111 (5th Cir. 1974); *see also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent all "decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to close of business on that date.") Because we have concluded that Woods' loans to Michael and Greenbaum were investments, it follows that the promissory notes in dispute were investment paper not subject to the exclusion in § 78c. *See Bellah*, 495 F.2d at 1112-13 (explaining that the application of the exclusion "ultimately hinges upon whether the note executed . . . can be characterized as commercial or investment in nature").

[2]     Because no party argues otherwise on appeal, we assume—without deciding—that the allegations of Woods' complaint also satisfy the remaining elements of a securities-fraud claim, such that the conduct alleged "would have been actionable as fraud in the purchase or sale of securities."

B. The Securities-Fraud Claims

A Rule 12(b)(6) dismissal on statute-of-limitations grounds is appropriate where "it is apparent from the face of the complaint that the claim is time-barred." *Gonsalvez*, 750 F.3d at 1197. The limitations period for civil claims under the Securities Act is set by 15 U.S.C. § 77m, which provides:

> No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, <u>or after such discovery should have been made by the exercise of reasonable diligence</u> . . . . In no event shall any such action be brought to enforce a liability created . . . under section 77*l*(a)(2) of this title more than three years after the sale [of the security].

15 U.S.C. § 77m (emphasis added). The one-year limitations period of § 77m begins to run when the victim of securities fraud is first placed on "inquiry notice." *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002). In this context, the term "inquiry notice" refers to "knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." *Id.* "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Id.*

As discussed above, this case arises from a series of transactions that occurred between April of 2014 and June of 2018. The most recent of these took place on June 13, 2018, at which time Michael and Greenbaum assured Woods that he would receive full repayment of his loans—as well as several additional forms

of compensation—within six months.  Woods therefore would have been aware, by December of 2018 at the latest, that Michael and Greenbaum had broken their promises once again.  In our view, that knowledge would have led any reasonable person "to begin investigating the possibility that his legal rights had been infringed," even if that person did not have "full exposition" of the defendants' fraudulent scheme at that time.  This is especially true in light of the fact that Michael and Greenbaum already had failed to repay Woods multiple times before.  Yet Woods did not raise his securities-fraud claims until October 30, 2020—more than one year after he was placed on inquiry notice of the alleged deception.  Thus, we deem it apparent from the face of Woods' complaint that his claims under the Securities Act are time-barred.[3]

---

[3]    Woods argues that, even if he did receive inquiry notice of the defendants' fraud in December of 2018, the doctrine of equitable estoppel should have tolled the limitations period. He relies on *Cook v. Deltona Corp.*, in which this Court held that equitable estoppel applies "where the parties recognize the basis for suit, but the wrongdoer prevails upon the other to forego enforcing his right until the statutory time has lapsed."  753 F.2d 1552, 1563 (11th Cir. 1985).  According to Woods, the defendants deceptively persuaded him to forego enforcing his rights by offering him additional money and equity in exchange for not filing suit.

But even if we assume that the tolling rule of *Cook* applies to a situation such as this, Woods' claims would still be untimely.  As discussed above, the defendants' failure to fulfill their end of the bargain by December of 2018, as they had promised, would have given Woods reason to investigate potential fraud.  Woods has not alleged that the defendants made any further attempts to stave off litigation after that point.  Consequently, Woods' reliance on *Cook* is misplaced.

## III.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.[4]

**AFFIRMED.**

---

[4]    Woods did not challenge the district court's decision to decline supplemental jurisdiction over his state-law claims after dismissing his federal ones.  We therefore do not address that issue.