### A00A2081. BOGLE v. BRAGG et al.
(548 SE2d 396)

PHIPPS, Judge.

Joe Bogle sued Chestatee Minerals, Inc., a mining company; directors John Bragg, Ian Bragg, David Bragg, and Nancy Koppes; and corporate attorney Kenneth Antley for damages arising out of his failed investment in Chestatee. The trial court granted summary judgment to the defendants, and Bogle appeals. We affirm for reasons which follow.

> In ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion.[1]

On appeal of the grant of summary judgment, we must determine whether the trial court erred in concluding that no genuine issue of material fact exists and that the defendants were entitled to summary judgment as a matter of law.[2] Defendants may prevail "by showing the court that the documents, affidavits, depositions and

---

[1] *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 596 (370 SE2d 843) (1988).

[2] *Moore v. Food Assoc.*, 210 Ga. App. 780, 781 (437 SE2d 832) (1993).

other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case."[3] Our review is de novo.[4]

Viewed in the light most favorable to Bogle as the nonmoving party, the record shows that in April 1996, Bogle met with attorney Antley in connection with a possible hotel franchise investment. Bogle gave Antley a $2,000 retainer check, but told him not to perform any legal work until he had secured a loan. Antley returned the retainer when the investment fell through. Antley and Bogle spoke a few months later, and Antley told Bogle about another investment opportunity.

Bogle had worked in the mining industry as a director of operations for Buckhorn Minerals, Inc. Antley informed Bogle that Chestatee was looking for investors and a plant manager. Bogle was familiar with Chestatee from his work with Buckhorn and expressed interest. Antley told Chestatee principals John Bragg and Ian Bragg about Bogle, and Ian Bragg called Bogle and arranged a meeting. At the meeting, John Bragg, Ian Bragg, and Bogle discussed Chestatee's potential, Bogle's background, the possibility of Bogle's employment with Chestatee, and a possible investment by Bogle in Chestatee.

The Braggs told Bogle that Chestatee mined high-quality talc and that the only comparable source was in the northeast. They told him that Chestatee was currently profitable, although it had suffered losses in the past. Bogle was interested in the plant manager position and agreed to an annual salary of $40,000. The Braggs told Bogle that he could buy stock in Chestatee at $18.75 a share. Bogle offered to draw up an agreement to cover both his employment and a stock purchase.

Bogle drafted a Terms of Employment and Stock Purchase Agreement, dated August 6, 1996 (the Purchase Agreement). Under the draft Purchase Agreement, Chestatee agreed to hire Bogle as its operations manager. Either party could terminate Bogle's employment relationship with three months prior notice. Bogle agreed to purchase 3,000 shares of Chestatee stock for $56,250. Chestatee agreed to redeem Bogle's stock upon 30 days prior notice.

On August 7, 1996, Bogle, his wife, and Ian Bragg met to discuss the Purchase Agreement. Before the meeting, Bogle spoke with Antley, and, at his suggestion, Bogle made handwritten revisions to the Purchase Agreement to reflect that the Chestatee stock was redeemable "at the prevailing stock price, but not less than the original contribution of $56,250."[5] Ian Bragg told Bogle that a Chestatee

---

[3] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[4] *Walker v. Virtual Packaging*, 229 Ga. App. 124 (493 SE2d 551) (1997).

[5] Bogle's original draft of the Purchase Agreement provided that his stock was redeemable at par value.

financial statement would be ready in a few days and that Bogle would receive it in due course. On behalf of Chestatee, Ian Bragg executed the Purchase Agreement with Bogle at the August 7 meeting, and Bogle tendered the stock purchase price. Bogle also executed a Subscription Agreement in which, among other things, he acknowledged "receipt of any and all information related to [Chestatee], its property, including its real property, and its proposed mining operations, and which [Bogle] considers necessary or appropriate for deciding whether to purchase the [stock]." He also acknowledged that he was capable of evaluating the merits and risks of the investment.

Bogle began work at Chestatee on August 8, 1996. On August 14, Bogle and Ian Bragg reexecuted the Purchase Agreement, which was retyped to reflect the handwritten changes to the document executed on August 7.

On September 17, 1996, Bogle asked that Chestatee redeem his stock at the original $56,250 purchase price, but his stock was never redeemed. On October 14, 1996, Bogle submitted a letter of resignation. On December 4, 1996, Bogle sued Chestatee for breach of contract. Chestatee filed for Chapter 11 bankruptcy on June 26, 1997. On January 20, 1998, Bogle brought this suit against the defendants for common law fraud, securities fraud, and corporate waste.

1. Fraud has five elements:

(1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.[6]

### Nancy Koppes and David Bragg

Bogle did not meet, speak to, or correspond with Koppes or David Bragg before the stock purchase. As there was no communication, there could be no misrepresentation by these defendants. Bogle's claim of fraud against Koppes and David Bragg must fail, and the trial court did not err in granting summary judgment to Koppes and David Bragg on this count.

---

[6] (Citations and punctuation omitted.) *Reeves v. Edge*, 225 Ga. App. 615, 617-618 (2) (484 SE2d 498) (1997).

## John Bragg and Ian Bragg

Bogle argues that John Bragg and Ian Bragg made a number of false representations in connection with his purchase of Chestatee stock. These include: (1) Ian Bragg's representation to Bogle's wife that Bogle could get the stock purchase money back at any time; (2) their representation to him that the proceeds of the stock purchase were to be used for "reorganizational working capital," but the money was never used as working capital; (3) Ian Bragg's never-fulfilled promise to give Bogle financial information on Chestatee; (4) the Subscription Agreement provision that Chestatee was in the organizational stages and had no operational history, although the corporation had been conducting business for four years; and (5) the Subscription Agreement disclosure of a $165,000 lien against Chestatee's real property when there were additional undisclosed liens against the real property and security interests in corporate personal property. Bogle also claims that John Bragg and Ian Bragg committed fraud by failing to disclose material information.

Actionable fraud cannot be based on statements and promises as to future events, except that fraud may be predicated on a promise made with a present intention not to perform.[7] With respect to Ian Bragg's representation that Chestatee would refund Bogle's investment at any time, the Purchase Agreement provides for a redemption of Bogle's stock by Chestatee at no less than the original subscription price. To support a present knowledge on the part of Ian Bragg that Chestatee would not honor its contractual commitment, Bogle points to Chestatee's financial condition. There is evidence that Chestatee defaulted on a note in the past and faced possible litigation in the future. But Chestatee was an operating corporation, it continued to operate after Bogle left, and it is not shown that Chestatee was Ian Bragg's alter ego. Ian Bragg's representation regarding Chestatee concerns the future actions of a third party and cannot be fairly characterized as made with the present intent to cause Chestatee not to redeem Bogle's stock.

Although Bogle charges that proceeds of his stock purchase were not used for "reorganizational working capital," Bogle has not presented evidence to that effect. The record indicates Bogle's investment money was paid to Chestatee, and there is nothing to support an allegation that the funds were wrongfully diverted to any of the defendants.

With respect to the representations in the Subscription Agreement regarding the operational history of Chestatee and the liens on

---

[7] *Wheeling v. Ring Radio Co.*, 213 Ga. App. 210, 211 (444 SE2d 144) (1994).

its real property, even if these statements can be considered material misrepresentations, Bogle cannot show that he was justified in relying upon them. In order to establish justifiable reliance, Bogle must show that he exercised due care to discover the fraud.[8] Bogle knew that Chestatee had an operational history, because he had business dealings with the company when he was an officer with Buckhorn Minerals. The liens on the corporate property were a matter of public record.[9] "In the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations[;] failure to do so will bar an action based on fraud."[10]

Although Bogle maintains that the Braggs promised to provide financial statements for Chestatee which were never delivered, it was his choice to proceed with the stock purchase without them. And in the Subscription Agreement Bogle agrees that he received "any and all information relating to [Chestatee], its property, . . . and its proposed mining operations, and which [Bogle] considers necessary or appropriate for deciding whether to purchase the Securities." Bogle also "acknowledge[d] that he [had] been afforded access to all financial and other information relating to [Chestatee]."

Bogle argues that John Bragg and Ian Bragg fraudulently failed to disclose material information about Chestatee, including its unprofitability and litigation status. Bogle can point to evidence that Chestatee had been in default on a note in the past and faced possible future litigation. This is not inconsistent with representations made by John Bragg and Ian Bragg to Bogle before the stock purchase that Chestatee had struggled in the past. And Bogle cannot show that Chestatee was unprofitable at the time he discussed the stock purchase with John Bragg and Ian Bragg.

We note that neither John Bragg nor Ian Bragg had a special duty to Bogle to make disclosures about Chestatee. Suppression of a material fact is fraud only if there is a duty to disclose arising from a fiduciary relationship or the particular circumstances of the case.[11] Although they were directors of Chestatee, the Braggs did not have a fiduciary duty to Bogle at the time the Purchase Agreement was negotiated. This was an arm's length transaction between persons experienced in the mining business. Bogle refers us to *King Mfg. Co. v. Clay*,[12] which involved an alleged scheme by two directors to buy

---

[8] *Ga. Farm &c. Ins. Co. v. Allen*, 228 Ga. App. 607, 608 (492 SE2d 339) (1997).

[9] See *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989).

[10] (Citation and punctuation omitted.) *Nicholson v. Harris*, 179 Ga. App. 35, 37 (3) (345 SE2d 63) (1986).

[11] OCGA § 23-2-53.

[12] 216 Ga. 581 (118 SE2d 581) (1961).

stock from existing shareholders under false pretenses. The facts are dissimilar, and the analysis touching on the duty of a director to existing shareholders is inapposite because Bogle was not a shareholder when the alleged fraudulent transaction occurred.

We find other authority presented by Bogle to be unpersuasive as well. In *Vaughan v. Oxenborg*,[13] the plaintiff claimed that defendants had set up an elaborate scheme to divert the plaintiff's stock purchase funds for their own use. There is no evidence that Bogle's investment proceeds were converted by the defendants. And *Adkins v. Lee*[14] is distinguishable because the defendant concealed the corporation's financial condition and caused it to issue the plaintiff nonvoting stock rather than the promised voting stock.

For the foregoing reasons, the trial court did not err in granting summary judgment to John Bragg and Ian Bragg on Bogle's claim of fraud.

### Kenneth Antley

Bogle testified that Antley put him in touch with the Braggs and that Antley told him "about what a safe investment [Chestatee] would be and what a fine family the Braggs were." This was a statement of opinion, and Bogle was not entitled to rely upon it as a statement of fact.[15]

Bogle also contends that Antley was familiar with Chestatee's financial problems and that, because Antley stood in a fiduciary relationship with him, Antley fraudulently failed to disclose this material adverse information. But Bogle has not presented evidence which would authorize a finding that Antley had a fiduciary duty to Bogle with respect to Bogle's investment in Chestatee.

> A relationship is confidential when "one party is so situated as to exercise a controlling influence over the will, conduct, or interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58. "[T]he mere fact that one reposes trust and confidence in another does not create a confidential relationship. . . . [A] confidential and fiduciary relationship . . . must be shown by proof, and the burden is

---

[13] 105 Ga. App. 295 (124 SE2d 436) (1962).
[14] 127 Ga. App. 261, 263 (1) (193 SE2d 252) (1972).
[15] *Buckner v. Mallett*, 245 Ga. 245, 246 (1) (264 SE2d 182) (1980).

upon the party asserting the existence of such relationship to affirmatively show the same."[16]

The record indicates that while Bogle met with Antley concerning another investment, Antley did not do any legal work for him and was not paid any money. Bogle did not ask Antley to represent him in connection with the purchase of Chestatee stock. Bogle talked to Antley about the Purchase Agreement Bogle had drafted, but Antley told Bogle that he represented Chestatee's interests in that transaction.

We find that the trial court did not err in granting summary judgment to Antley on Bogle's claim of fraud.

### Civil Conspiracy

Bogle claims that the defendants entered into a civil conspiracy to defraud him. "A civil conspiracy has been defined as a combination between two or more persons to do some unlawful act which is a tort. . . ."[17] The record does not support a conspiracy among the defendants to commit an unlawful act.

2. Bogle claims the defendants committed securities fraud under OCGA § 10-5-12 (a) (2). But we have found no evidence of fraud in the stock purchase transaction, and Bogle does not present an argument for the existence of securities fraud separate from the transaction considered in Division 1.[18] We find the trial court did not err in granting summary judgment to the defendants on Bogle's claim of securities fraud.

3. Bogle's complaint asserts that John Bragg, Ian Bragg, David Bragg, and Koppes, acting as corporate directors, mismanaged Chestatee. This is an action for corporate waste and, as such, is a derivative action that must be maintained by Bogle as a shareholder for the benefit of the corporation and not for his individual benefit.[19] The trial court correctly ruled that Bogle had no standing to assert this claim.

*Judgment affirmed. Johnson, P. J., and Smith, P. J., concur.*

---

[16] (Citations omitted.) *Allen v. Hub Cap Heaven*, 225 Ga. App. 533, 537 (4) (484 SE2d 259) (1997).

[17] (Citations and punctuation omitted.) *Sofate of America v. Brown*, 171 Ga. App. 39, 40 (1) (318 SE2d 771) (1984).

[18] See *William Goldberg & Co. v. Cohen*, 219 Ga. App. 628, 633 (1) (c) (466 SE2d 872) (1995).

[19] OCGA § 14-2-831. See *Pickett v. Paine*, 230 Ga. 786, 790 (1) (199 SE2d 223) (1973).

DECIDED MARCH 15, 2001.

*Marvin P. Nodvin*, for appellant.

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Robert G. Tanner, Garland, Samuel & Loeb, Robin N. Loeb, Anne Coolidge-Kaplan*, for appellees.