### A03A1535. SUMTER REGIONAL HOSPITAL, INC. v. HEALTHWORKS, INC.

(589 SE2d 666)

MIKELL, Judge.

Healthworks, Inc. ("Healthworks") sued Charles Davis, M.D. and Robert Bartosh, M.D., d/b/a Americus Orthopaedic Associates ("P.A."), and Sumter Regional Hospital, Inc. (the "Hospital"), alleging breach of contract, conduct in restraint of trade, and tortious interference with contractual relations. Drs. Davis and Bartosh filed a motion for summary judgment, which the trial court granted as to actual damages and denied as to nominal damages.[1] The Hospital also filed a motion for summary judgment, the denial of which is the subject of this appeal.

The Hospital asserts five related errors, four of which set forth reasons the trial court erred in denying summary judgment on Healthworks' tortious interference claim.[2] The remaining error chal-

---

[1] The trial court's grant of the physicians' motion for summary judgment is not the subject of this appeal.

[2] Healthworks abandoned its restraint of trade claim in its response to the Hospital's motion for summary judgment.

lenges the trial court's denial of summary judgment on Healthworks' claim for punitive and bad faith damages. Because Healthworks has not established that a genuine issue of material fact remains for jury consideration on the tortious interference claim, we reverse.

"When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence."[3] Where there is no evidence sufficient to create a genuine issue of fact on at least one essential element of plaintiff's claim, however, we must grant summary judgment to the defendant.[4] The evidence shows that P.A. and Healthworks entered a management service agreement (the "Agreement") on January 10, 1998, wherein Healthworks agreed to provide rehabilitation management services to P.A., in exchange for 40 percent of the net proceeds of fees collected from patients treated at Americus Rehab, a new rehabilitation clinic owned by P.A. Americus Rehab opened in February 1999. In a letter dated May 18, 2000, Dr. Bartosh notified Healthworks' chief executive officer ("CEO"), Cole Blair, that he was going to terminate the Agreement at the end of June due to the unprofitability of the venture. On September 5, 2001, Healthworks filed its complaint, alleging that the Hospital exerted economic pressure on the co-defendants to persuade them to refer patients to the Hospital for rehabilitative services, which conduct constituted unlawful restraint of trade and tortious interference with contractual relations. Healthworks also alleged that the Hospital engaged in bad faith, which entitled Healthworks to recover attorney fees and the expenses of litigation. The Hospital filed a motion for summary judgment, arguing that Healthworks' action must fail because there was no evidence that the Hospital induced the doctors to refer patients to it and because Healthworks could not establish damages.

1. In its first four enumerations of error, the Hospital argues that the trial court's denial of its motion for summary judgment on Healthworks' claim for tortious interference was erroneous, and we agree.

> The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an antici-

---

[3] (Citation omitted.) *Stanford v. Paul W. Heard & Co.*, 240 Ga. App. 869-870 (1) (a) (525 SE2d 419) (1999).

[4] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

pated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.[5]

The "improper action" or "wrongful conduct" required to substantiate a tortious interference claim "generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions."[6] Where the plaintiff cannot raise an issue of fact as to this first requirement, the tortious interference claim must fail.[7]

The wrongful conduct alleged in the instant case was the Hospital's exertion of pressure on P.A. to refer patients requiring rehabilitation to the Hospital, rather than to Americus Rehab. In support of its allegation, Healthworks relies solely on two statements in the May 18 letter from Dr. Bartosh to Blair. Dr. Bartosh referred to "strong negative pressure" that he was getting from the Hospital and the PHO and stated that the Hospital's CEO, Jerry Adams, had worked very hard to try to "lock out" Americus Rehab from the local employers. Healthworks maintains that if the conduct referenced in these statements occurred, the first three elements of its claim for tortious interference are satisfied. The evidence in the record, however, is to the contrary.

When Dr. Bartosh was asked what he meant by "the strong negative pressure [he was] getting from Sumter Regional Hospital," he deposed that:

A. Well, there was nothing direct, but there was, I think some indirect things. I think my association with Jerry or my relationship with Mr. Adams changed at that point in time. It become [sic] a bit adversarial. The hospital did try at about that time to recruit some other orthopedists as direct competition to us. Now whether that was — I don't know the reasons for that, but that had never happened before. . . . So it was kind of really a feeling more than anything direct. Also, at this point in time, we were still having a hard time getting patients through the [South Georgia Health Care Association] PHO to come. And again, although nothing — I guess I interpreted some of that initially when I had some

---

[5] (Citations and footnotes omitted.) *Blakey v. Victory Equip. Sales*, 259 Ga. App. 34, 38 (2) (d) (576 SE2d 288) (2002).

[6] (Citation and punctuation omitted.) *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739, 741-742 (492 SE2d 526) (1997). Accord *Culpepper v. Thompson*, 254 Ga. App. 569, 572 (c) (2) (562 SE2d 837) (2002).

[7] *Beeson v. Crouch*, 227 Ga. App. 578, 582 (3) (490 SE2d 118) (1997).

discussions with Doctor Davis and I thought that some of this was direct. It turned out that there were no direct things. . . . So there was nothing directly done, but I think some of the things that were occurring at that point in time — just the atmosphere and I think my relationship with Mr. Adams and everything. And since nothing else had changed, this was the only thing different, so I inferred that. . . .

Q. Other than recruiting an orthopedic surgeon or trying to recruit an orthopedic surgeon, were you referring to anything else that the hospital was doing that you were writing about here in this letter that you call strong negative pressure.

A. I can't think of anything specific.

When asked what pressure he received from the PHO, Dr. Bartosh deposed:

> We didn't receive pressure. We were not getting people that were in the PHO approved to our therapy unit. . . . [W]e were filing their insurance claims because we owned it under our tax ID numbers. And since both Doctor Davis and I were a member [sic] of the PHO, it should not have been a problem. . . . But as far as I know, nothing was done directly from the hospital or from Mr. Adams or from the leadership of the PHO.

Dr. Davis, who was a board member of the PHO, deposed that the PHO never exerted any pressure on P.A. to refer its patients to the Hospital.

Regarding the comment that "[t]he present hospital CEO has worked very hard to lock out this physical therapy service," Dr. Bartosh stated, "[w]ell, we had no direct proof of anything, but again, things that we have reiterated. We seemed to be having a difficult time getting into the PHO, getting employers that are in the PHO to send patients, so we were having a difficult time getting everybody that we wanted to refer into our system." When asked specifically about Adams' efforts, Dr. Bartosh explained:

> I think just the change in attitude that we had to each other. I mean, I am sure that I am part of the blame of that, but there was a change in our working relationship, and it seemed to sour, which had been a good relationship prior to this. I mean, I understand that this is business and if another orthopedist comes into town that is recruited against me, I am going to try the same thing, to not send him any business. I mean, that is business. Is it unfair? No.

Did Mr. Adams do anything dirty or crooked? Not that I am aware of anything like that. I think he practiced good business as the CEO of a major corporation in this town.

Dr. Bartosh also deposed that no one connected to the Hospital, including Adams, directly influenced him to send patients to the Hospital but that he made his determination of where to send a patient based on that patient's desires and needs; that between February 1999, and March 31, 2002, he referred approximately 95 percent of his patients to Americus Rehab; and that during the last three months of Americus Rehab's operation, he did not change his referral patterns in that he always referred patients based upon their medical needs or their requests. In addition to Dr. Bartosh's testimony, there is a plethora of other evidence in the record that supports the Hospital's argument that Healthworks' claim for tortious interference should not have survived summary judgment.

Dr. Davis deposed that his referral of patients to the Hospital rather than Americus Rehab did not result from direct or indirect pressure from the Hospital. Further, Dr. Davis deposed that neither Adams nor anyone else affiliated with the Hospital exerted any pressure on him and Dr. Bartosh to terminate the Agreement with Healthworks. Dr. Davis explained that he wanted to terminate the Agreement because the venture with Healthworks was not profitable and specifically recalled sharing this fact with Blair. In an affidavit, Adams averred that he did not exert any economic or other pressure on the doctors to persuade them to refer patients to the Hospital or to terminate their contract with Healthworks, nor did he know of anyone affiliated with the Hospital who had done so. Healthworks has not presented any admissible evidence to the contrary.

Blair deposed that Healthworks' tortious interference claim was based solely on Dr. Davis' and Dr. Bartosh's comments to him that the Hospital put pressure on the PHO to lock the doctors out of the PHO and threatened to open a competing orthopedic practice. However, this testimony concerning the doctors' alleged statements is hearsay, which has no probative value and cannot be considered as evidence on summary judgment.[8] Blair deposed that other than what he was told by Drs. Davis and Bartosh, he did not know of any pressure exerted by the Hospital.

"[G]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment."[9] Therefore, in light of the une-

---

[8] *Sumter Regional Hosp. v. Sumter Free Press,* 248 Ga. App. 780, 782 (1) (546 SE2d 831) (2001).

[9] (Citations and punctuation omitted.) *Watkins & Watkins, P.C. v. Colbert,* 237 Ga. App. 775, 778 (516 SE2d 347) (1999).

quivocal testimony of Drs. Davis and Bartosh that the Hospital did not influence P.A. to terminate the Agreement and Healthworks' inability to point to any evidence of specific instances of misconduct on the Hospital's part, we cannot infer from Dr. Bartosh's letter to Blair that the Hospital acted improperly or engaged in wrongful conduct. Since the Hospital has shown that an essential element of Healthworks' claim for tortious interference could not be proven under any theory, there remains no genuine issue of material fact to be tried by the jury on this claim,[10] and the Hospital is entitled to summary judgment as a matter of law.

2. In light of our decision in Division 1, the Hospital's remaining enumeration of error, which relates to damages, is rendered moot.

*Judgment reversed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED NOVEMBER 12, 2003.

*Fennessy & Nettum, Michael A. Fennessy, Alston & Bird, Angela T. Burnette,* for appellant.

*Howard S. McKelvey, Jr., J. Michael Greene,* for appellee.

---

[10] *St. Mary's Hosp. of Athens v. Radiology Professional Corp.*, 205 Ga. App. 121, 124 (2) (421 SE2d 731) (1992); *Munna v. Lewis*, 181 Ga. App. 860, 862-863 (2) (354 SE2d 181) (1987).
[1] Apparently conceding that sovereign immunity bars her claims against the county, Reed admits "there is no statutory authority promulgated by the General Assembly which would permit Appellant's claims against DeKalb County."