**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 21, 2023**

# In the Court of Appeals of Georgia

A22A1627, A22A1633. OVERLOOK GARDENS PROPERTIES, LLC et al. v. ORIX, USA, LP et al.; and vice versa.

MARKLE, Judge.

These appeals stem from a dispute involving commercial loan transactions for financing several multifamily apartment complexes, and whether the contracts and applicable regulations required the lender to make certain disclosures. Specifically, Overlook Gardens Properties, LLC; Creekwood Apartments, LLC; Greystone at Inverness II, LLC; and Greystone Farms Apartment Community, LLC (collectively "Overlook") appeal from the Georgia State-Wide Business Court's partial grant of summary judgment in favor of Orix USA, LP; Red Mortgage Capital, LLC; and Red Capital Markets, LLC (collectively "Orix") as to Overlook's claims of breach of contract, fraud, and violations of the RICO statute. Orix cross-appeals on the narrow issue that the business court erred by failing to grant summary judgment in its favor

as to one of Overlook's fraud claims. For the reasons that follow, we affirm the court's grant of summary judgment in favor of Orix as to Overlook's breach of contract, fraud, and RICO claims. We reverse the court's denial of summary judgment as to Overlook's claim of fraud regarding its loan.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, [Appellants], as the moving part[ies] must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation omitted.) *Lowery v. Noodle Life*, 363 Ga. App. 1 (869 SE2d 600) (2022).

So viewed, the record shows that Overlook is in the business of developing apartment complexes financed via loans through the Department of Housing and Urban Development's (HUD) Multifamily Accelerated Processing program (MAP). Overlook hired Orix[1] to assist in obtaining this financing at the "best available

---

[1] Appellees include Red Mortgage Capital, as the lender, and Red Capital Markets. Orix USA, LP is the parent company of Red Capital Group, LLC, of which

2

interest rate." Between 2012 and 2015, Overlook entered into four separate FHA-insured loans with Orix, and the parties executed a series of documents memorializing the terms of the loans, including the Application Letter, a Commitment Letter, and a Rate Lock Letter.

The Application Letter allowed Orix to process the loans at a specified interest rate, and to apply to HUD for insurance on the loans. The Commitment Letter indicated that, once HUD approved the application, Orix would provide the loan with particular terms for acceptance by Overlook. Finally, the Rate Lock Letter required Overlook to be obligated under the loan, with Orix obtaining a set maximum interest rate for the loans at or below the specified rate. Additionally, the Application, Commitment, and Rate Lock Letters each contained a disclaimer indicating that neither created a fiduciary relationship between the parties. The parties also had a Confirmation Letter for each loan, which constituted the final, binding agreement between the parties as to the pricing terms that would apply to the loans.[2]

---

Red Mortgage and Red Markets are subsidiaries. Also, Appellants originally named as defendants Red Capital Group, LLC and Red Capital Partners, LLC, but they were subsequently dismissed.

[2] All of these letters are generally form contracts and contain nearly identical provisions applicable to all of the loans.

Most relevant to this appeal is the Commitment Letter, which states that Orix is solely responsible for determining the final interest rate, and confirms Orix's obligation to use its best efforts to confirm the pricing terms and to execute Overlook's loans. The Commitment Letter also gave Orix the right to secure and fund the loans by issuance of mortgage-backed securities sponsored by the Government National Mortgage Association (GNMA), and it further contained a provision indicating that Overlook reserved no rights to any benefits as a result thereof. The Commitment Letter also contained a merger clause, indicating that it superseded any previous or contemporaneous written or oral agreements between the parties.

The loans were also governed by certain HUD policies and regulations as set out in the 2011 MAP Guide. Per the regulations, the lender was not required to disclose the "trading premium" the lender earned by selling the loans on the secondary market. However, the lender was required to pay any fees to its brokers and consultants from the disclosed lender's fees. 2011 MAP Guide, Ch. 2, Sec. 2.3 (h) (1) (b).

Orix engaged Scott Taccati of Trillium Capital Resources, a commercial real estate loan consulting firm (collectively, "Taccati"), to assist with the loan process. Orix paid Taccati for his services based on a fee-splitting agreement comprised of a

4

portion of the fees it received from Overlook and a portion of the trade premiums Orix received after selling the loans on the secondary market. Additionally, with respect to the Overlook loan specifically, Orix submitted a document to HUD, which specified that it would pay Taccati $22,080 for his services from the initial service charge it collected from Overlook.

Orix secured an interest rate for all four loans lower than the maximum rate set in the Rate Lock Letters, and the parties closed on the respective loans. At closing, Overlook's counsel certified that there were no side deals or transactions outside the four corners of the loan documents that would in any way alter or modify the written loan terms. After the closing, Orix sold the loans on the secondary market and earned a profit on them.

Believing that it was deceived into entering these contracts at the proposed interest rates because Orix failed to fully disclose the interest rates and the fees it paid to Taccati, Overlook filed suit in state court, asserting claims of breach of contract, fraud, and violations of the RICO statute. Orix moved for summary judgment, and, thereafter, the case was transferred to the business court.

Following a hearing, the business court granted in part Orix's summary judgment motion, finding, among other things, that: (1) in support of its breach of

contract claim, Overlook presented no agreement showing that Orix was obligated to obtain the *best* interest rate, nor had it presented any evidence showing Overlook could have achieved better interests rates than those actually procured by Orix; and (2) that Orix was under no obligation to disclose to Overlook the profit it made from selling their loans on the secondary market. The business court found, however, that one of Overlook's fraud claims survived summary judgment to the extent it was based on an alleged misrepresentation Orix made to HUD regarding the fees Taccati would receive. These appeals followed.

*Case No. A22A1627*

1. Overlook's claims for breach of contract, fraud, and violations of the RICO statute are premised on its contention that Orix failed to use its best efforts to secure the best interest rates on the loans, and it failed to disclose the fees Taccati would receive for his services in connection with securing the loans. We address each of Overlook's claims separately, but find its arguments unpersuasive.

(a) *Breach of contract claims*

Overlook asserts that Orix breached its contractual promise to exercise good faith in obtaining the best available interest rates. We disagree.

6

"[T]he elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." (Citations omitted.) *Bazemore v. U. S. Bank Nat. Assn.*, 363 Ga. App. 723, 731 (e) (872 SE2d 491) (2022).

> [T]he cardinal rule of contract construction is to ascertain the intention of the parties, as set out in the language of the contract. Indeed, it is well established that the construction of a contract is a question of law for the court, involving three analytical steps: The first step is to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning. Second, if the language of the contract is ambiguous in some respect, the rules of contract construction must be applied by the court to resolve the ambiguity. And finally, if ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury [or the trial court at a bench trial]. So, when the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to determine the parties' intent.

(Citations, punctuation and emphasis omitted.) *Emory Healthcare v. van Engelen*, 362 Ga. App. 818, 821-822 (870 SE2d 223) (2022). Moreover,

> we must look at the instrument as a whole and consider it in light of all the surrounding circumstances. Thus, the favored construction will be

7

that which gives meaning and effect to all the terms of the contract over that which nullifies and renders meaningless a part of the document.

(Citation and punctuation omitted.) *Primary Investments v. Wee Tender Care III*, 323 Ga. App. 196, 198 (1) (746 SE2d 823) (2013).

(i) *No contractual duty to provide "best available rates."*

To begin, the loan documents at issue describe Orix's obligation to Overlook — to process the loans at a specified interest rate to be accepted by Overlook; to apply to HUD for insurance on the loans; and to obtain an interest rate *at or below* the rate specified in the Rate Lock Letter. It is undisputed that Orix fulfilled these obligations by securing the loans for Overlook at interest rates at or below those specified in the Rate Lock Letter and obtaining HUD insurance.

As Orix notes, Overlook has failed to point to any specific provision of the written contract Orix allegedly breached. *Alpha Balanced Fund v. Irongate Performance Fund*, 342 Ga. App. 93, 98 (1) (802 SE2d 357) (2017) (party claiming breach must prove a breach of an obligation imposed by the contract). Under the plain language of the contracts, none of the loan documents place an obligation Orix to get Overlook the *best* interest rate. *Emory Healthcare*, 362 Ga. App. at 821-822 (where

the language of the contract is clear and unambiguous it is enforced according to its plain terms).

At most, the Commitment Letter requires that Orix "shall use it best efforts to *confirm* those pricing terms"; i.e., those terms expressed in the Rate Lock Letter, including the interest rate, discount points, prepayment penalties and restrictions, and extension costs. Nothing in the contract required Orix to obtain the best available rate. Moreover, the Commitment Letter specifically states that Orix is solely responsible for determining the final interest rate, and that Overlook's acceptance and execution of the Rate Lock Letter is binding. And, the Commitment Letters and the Rate Lock Letters advised that "changing conditions in the financial market will impact upon the Final Interest Rate and the Pricing Terms" of Overlook's loans. Thus, Orix was obligated to use its best efforts to secure a favorable interest rate, but it could not guarantee the rate due to the financial market. Also, Overlook's representatives repeatedly confirmed in deposition testimony that the loan documents did not require Orix to obtain the best interest rates.

Overlook further contends there was evidence Orix could have obtained better rates, and that Overlook's expert could provide the jury with calculations to show

what the rates would have been without the alleged hidden premium. However, Overlook admitted it had no proof that another lender was able to deliver a rate lower than the rate obtained from Orix, and that it never approached other lenders or loan providers. William White, one of the members of Greystone Farms, further admitted that, in his 36 years of experience in the real estate business and with obtaining various loans, the interest rate Orix provided on the Greystone loan was the lowest rate that he had ever obtained. And, with respect to the Overlook loan in particular, Paul Hinman, Overlook's asset manager and designated corporate representative, admitted Overlook was satisfied with the rate received; that the interest rate Orix provided was the prevailing market rate at the time and was an improvement over the existing loan it had; and that it wanted to proceed with the loan. To the extent Overlook claims it could present expert testimony to the jury of what the rates *would have been* had Orix not included an alleged hidden premium, such testimony amounts to mere speculation and does not refute the unequivocal testimony indicating otherwise. *Sumter Regional Hosp. v. Healthworks*, 264 Ga. App. 78, 82 (1) (589 SE2d 666) (2003) ("[G]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment."); see also *Ga. Real Estate Properties v. Lindwall*, 303 Ga. App.

10

12, 14 (1) (692 SE2d 690) (2010) (No way for jury to determine that the broker knew of property sale inquiries on or before expiration of listing date without relying on speculation).

Finally, Overlook argues that Orix breached its contractual duties by not acting in its sole and exclusive benefit, and thus breached the implied covenant of good faith and fair dealing by failing to obtain the "best interest rate." This argument is unavailing.

> The implied covenant of good faith and fair dealing inheres in every contract . . . and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. [It] involves inferring contractual terms to handle developments or contractual gaps that neither party anticipated. . . . And it is not an exception to the rule that courts will not alter the terms of a bargain sophisticated parties entered into willingly because a party now regrets the deal. Hence, the implied covenant does not apply when the subject at issue is expressly covered by the contract.

(Citations and punctuation omitted.) *The Rainmaker Group Ventures v. Bellack*, 354 Ga. App. 847, 851 (841 SE2d 738) (2020). The Application, Commitment, and Rate Lock Letters each contained a disclaimer indicating that it did not create a fiduciary relationship between the parties. And Hinman acknowledged that he understood there

11

was no fiduciary relationship. Thus, the loan documents clearly document an arm's length relationship between the parties. *Arp v. United Community Bank*, 272 Ga. App. 331, 334 (3) (612 SE2d 534) (2005) ("There is, moreover, particularly no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests."). Furthermore, the Commitment Letter plainly sets forth that Orix was solely responsible for determining the final interest rate,[3] and Overlook was free to accept it and be bound by it, or reject it. As we have explained, "[t]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." (Citation omitted.) *Griffin v. State Bank of Cochran*, 312 Ga. App. 87, 96-97 (2) (b) (718 SE2d 35) (2011).

(ii) *Merger clause*.

Overlook argues that the merger clause does not bar its claims and that parole evidence is permitted to explain any ambiguities with regard to Orix's duty and

---

[3] HUD regulations do not limit the lender's ability to determine the interest rate. See *HUD Multifamily Rental Project Closing Documents- Revisions and Updates Notice of Information Collection; 30-Day Notice*, 75 Fed. Reg. 80517, 80519 (II) (B) (Dec. 22, 2010).

12

promises to obtain the best interest rates. The merger clause bars these claims, however.

As indicated above, the plain and unambiguous language of the loan documents imposes no express obligation on Orix to obtain the best interest rate, and there are no ambiguities to this effect. *Emory Healthcare*, 362 Ga. App. at 821-822. "Although parol evidence as to the surrounding circumstances is admissible to explain ambiguities and to aid in the construction of contracts, it is not admissible to contradict or construe an unambiguous contract." (Citations and punctuation omitted.) *Coleman v. Arrington Auto Sales & Rentals*, 294 Ga. App. 247, 249 (2) (669 SE2d 4141) (2008); see also OCGA § 13-2-2 (1). Thus, Overlook's reliance on Orix's alleged oral promises to get the best rates directly contradicts the written contracts, and thus such promises are unenforceable. Furthermore, the Statute of Frauds requires that any agreement or contract related to land or the lending of money be in writing. OCGA § 13-5-30 (a), (a) (4), (7).

Moreover, Overlook acknowledged that the loan documents, specifically the Commitment Letter, contained a merger clause indicating that no prior or contemporaneous oral or written understanding of any kind can alter the agreement.

13

It is axiomatic that a merger or entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement. Thus, if the contract contains a merger clause, a party cannot argue they relied upon representations other than those contained in the contract.

(Citation and punctuation omitted.) *Pinnock v. Kings Carlyle Club Apartments*, 348 Ga. App. 72, 76 (1) (a) (819 SE2d 515) (2018). Hence, the merger clause in the loan documents forecloses reliance on any such oral representation.

(iii) *Failure to disclose trade premium and all fees and compensation*.

Although Overlook argues that Orix should be required to disclose any trade profits it received from selling the loans on the secondary market, they have pointed to no HUD regulation *requiring* such disclosure. Notably, HUD considered imposing a requirement upon lenders to disclose trade premiums to borrowers, but it specifically rejected it. See *HUD Multifamily Rental Project Closing Documents-Revisions and Updates Notice of Information Collection; 30-Day Notice*, 75 Fed. Reg. 80517, 80519 (II) (B) (Dec. 22, 2010). Neither the 2011 MAP Guide nor the FHA loan closing documents requires disclosure of trade profits to the borrower or to HUD. And, according to Orix's expert, it is industry practice for FHA lenders not

14

to disclose trade profits realized from the sale of the loans on the secondary market, particularly since the borrower is not a party to that transaction.

Seemingly conceding that the HUD regulations do not require such trade profits to be disclosed in the loan documents, Overlook instead argues that the Commitment Letter created a contractual duty to disclose the alleged pre-determined minimum trade premium built into the interest rate because it is the equivalent of additional compensation. But nothing in the plain and unambiguous language of the Commitment Letter specifically requires Orix to disclose the trade premium. See *Emory Healthcare*, 362 Ga. App. at 821-822.

Additionally, the Application and Commitment Letters gave Orix the right to do exactly what it did — to secure and fund the loans by issuance of mortgage-backed securities sponsored by GNMA. In fact, Hinman admitted that he knew Orix might securitize the loans and sell them in the open market. And, the Commitment Letter further provided that, once it made payment to the lender, Overlook reserved no rights, title, or interest whatsoever to receive any benefits as a result of the sale of the loans.

Overlook also asserts that the loan documents prohibited it from negotiating and shopping the interest rate Orix quoted. However, nothing prevented it from

15

conducting a reasonable inquiry, or even asking Orix questions, regarding any disclosures or any part of the loan process *before* closing on the loans. To the contrary, Hinman admitted Overlook never asked Orix any questions regarding securitizing the loans because "[w]e didn't feel like we needed to understand exactly what happened in the back end." Moreover, Overlook conceded that it is standard industry practice not to disclose trade premiums to borrowers. Thus, Overlook has pointed to no legal authority or contractual language requiring such disclosure of trade premiums, and this argument fails.

(b) *Fraud claim*

As for Overlook's fraud claims, Georgia law is clear that

> [t]o prevail on a fraud claim, including the tort of fraudulent inducement, the plaintiff must establish five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff.

(Citation and punctuation omitted.) *Educap, Inc. v. Haggard*, 341 Ga. App. 684, 686 (801 SE2d 611) (2017); see also *CSS Real Estate Dev. I v. State Bank and Trust Co.*, 324 Ga. App. 184, 185-186 (749 SE2d 773) (2013).

16

Generally, a fraud claim cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise, any breach of a contract would amount to fraud. An exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place.

(Citation and punctuation omitted.) *Saks Mgmt. and Assocs. v. Sung Gen. Contracting*, 356 Ga. App. 568, 575 (3) (a) (849 SE2d 19) (2020); see also *Hamilton v. Advance Leasing & Rent-A-Car*, 208 Ga. App. 848, 849 (2) (432 SE2d 559) (1993).

The first element [Appellants] must prove, misrepresentation of a material fact, can be demonstrated by either showing that a material fact was, in fact, misrepresented, or that a material fact was concealed by [Appellees]. In this latter situation, however, [Appellants] must further allege that a fiduciary or confidential relationship existed such that [Appellees] had a duty to disclose the material fact in question.

*Hubbard v. Stewart*, 651 FSupp. 294, 298 (IV) (M. D. Ga. 1987); see also OCGA § 51-6-2 (a) ("willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action."). With these general principles in mind, we turn

17

to Overlook's claims that Orix fraudulently concealed the trade premium and fees, and made affirmative fraudulent misrepresentations regarding the fees it paid Taccati.

(i) *No fraud by concealment because no duty to disclose trade premium*.

Overlook argues that there is at least a question of fact as to whether a confidential relationship existed between the parties such that Orix had a duty to disclose the trade premium. Overlook further argues that Orix fraudulently concealed that the trade premium was a material term of the loans and then affirmatively misrepresented the facts when Overlook asked. Again, we disagree.

Overlook premises its fraud claim on the same conduct that it alleges was a breach of contract. "The general rule in Georgia is that a breach of contract cannot constitute a tort unless a special or confidential relationship exists between the parties." *Willis v. Allstate Ins. Co.*, 321 Ga. App. 496, 501 (1) (740 SE2d 413) (2013). "Only when such a relationship is present can a party to a contract bring an action ex delicto against the party who owes a duty imposed by law as a result of the special relationship." *Miles v. Great Southern Life Ins. Co.*, 197 Ga. App. 540, 541 (1) (398 SE2d 772) (1990). Georgia law is clear that

> [a] relationship is confidential when one party is so situated as to exercise a controlling influence over the will, conduct, or interest of

18

another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

(Citations and punctuation omitted.) *Bogle v. Bragg*, 248 Ga. App. 632, 637 (1) (548 SE2d 396) (2001); see also OCGA § 23-2-58. However, "the mere fact that one reposes trust and confidence in another does not create a confidential relationship[.] [A] confidential and fiduciary relationship must be shown by proof, and the burden is upon the party asserting the existence of such relationship to affirmatively show the same." (Citation and punctuation omitted.) *Bogle*, 248 Ga. App. at 637-638 (1). "There is, moreover, particularly no confidential relationship between lender and borrower or mortgagee and mortgagor for they are creditor and debtor with clearly opposite interests." (Citation omitted.) *Arp*, 272 Ga. App. at 334 (3).

Here, the loan documents themselves clearly indicate that Orix reserved the right to securitize and sell the loans at a profit with Overlook having no rights thereto. Additionally, we cannot simply ignore that the Application, Commitment, and Rate Lock Letters each contained an explicit disclaimer indicating that neither was intended to create *any* joint venture, agency, or fiduciary relationship between the parties, and that Overlook agreed that Orix's services were being provided "as an

19

independent contractor at arm's length." As such, there can be no fiduciary relationship. *Newitt v. First Union Nat. Bank*, 270 Ga. App.538, 545-546 (4) (607 SE2d 188) (2004) ("[i]n the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone. For this reason, most business relationships are not generally confidential or fiduciary relationships.") (citation and punctuation omitted). Although Overlook argues that there was a confidential relationship based on its expectation of full disclosure, it has not shown that the "lender-borrower" relationship between the parties gives rise to a particular circumstance where Orix owed a duty to disclose any trade premium, nor can we re-write the loan documents to otherwise impose such a duty. *Primary Investments*, 323 Ga. App. at 198 (1) ("the favored construction of a contract will be that which gives meaning and effect to all the terms of the contract over that which nullifies and renders meaningless a part of the document.") (citation omitted). And, as to a claim for fraud, summary judgment is proper if at least one element of the fraud claim fails. *Arp v. United Community Bank*, 272 Ga. App. 331, 334 (3) (612 SE2d 534) (2005) ("So long as one essential element under any theory of recovery is lacking the defendant is entitled to summary judgment as a matter of

law irrespective of any issues of fact with regard to other essential elements.")

(Citation omitted.).[4]

(ii) *Merger clause*.

In addition, the merger clauses in the Commitment Letters preclude Overlook's

fraud claims.

> Parties claiming fraudulent inducement have two remedies: rescind the
> contract as voidable or affirm the contract and sue for damages. A party
> that rescinds is not limited by the contract terms. If, however, the party
> decides to affirm and sue on the contract, the contract terms control, and
> the party is bound by any merger clause or disclaimer.

---

[4] To the extent Overlook asserts that Orix affirmatively misrepresented the trade premium in response to a direct inquiry, such argument is without merit. In his response to Hinman's inquiry, James Croft, Orix's Chief Executive Officer, stated there was no "yield spread premium" associated with either the Overlook or Creekwood loans. Overlook has not shown that Croft's statement regarding "yield spread premium" was false. *Educap*, 341 Ga. App. at 686 (to prevail on fraud claim, plaintiff must establish that representation was false); see also *Saks Mgmt. and Assocs.*, 356 Ga. App. at 575 (3) (a) (fraud cannot be based on some future act or promise). Moreover, Croft's statements were made *after* the Creekwood Commitment and Confirmation Letters and *after* the parties closed on the Overlook loan. As such, Overlook has not shown how it relied on this alleged misrepresentation in closing on the loans. *Educap*, 341 Ga. App. at 686. Also, Orix's expert further confirmed that the terms "trade premium" and "yield spread premium" are not synonymous.

(Citation omitted.) *Pinnock*, 348 Ga. App. at 75 (1); see also *Weinstock v. Novare Group*, 309 Ga. App. 351, 356 (2) (710 SE2d 150) (2011) ("Where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail.") (citation and punctuation omitted). Because Overlook chose to affirm the loan documents, it is bound by the merger clause, and any alleged misrepresentations or promises it relied on outside of the four corners of the loan documents themselves are foreclosed by the merger clause.

(iii) *No affirmative fraudulent misrepresentation as to disclosure of all of Taccati's fees*.

Overlook contends Orix fraudulently misrepresented the fees it paid Taccati in connection with the loans; that HUD and the 2016 MAP guide requires full disclosure; and that Orix failed to disclose that Taccati's fees were not being paid solely from the disclosed lender's fees. In this regard, Overlook further asserts that because the misrepresentation as to Taccati's fees arise from representations in the

22

contract itself, the merger clause does not preclude its fraud claim on this issue.[5] We disagree.

The 2011 MAP guide, in effect at the time Overlook closed on its loans, requires that fees paid to brokers and consultants, like Taccati, must be paid from the disclosed lender's fees. See 2011 MAP Guide, Ch. 2, Sec. 2.3 (h) (1) (b) ("[t]he consultant's fee is paid from the mortgagee's fees.") Tellingly, the MAP guide sets forth requirements for what information must be disclosed to *HUD*, not to the borrower.[6] And nothing in the 2011 MAP guide specifically requires disclosure of the amount of fees paid to a consultant. There appears to be no dispute that Overlook

---

[5] Overlook argues that Orix fraudulently misrepresented the rate confirmation process, as stated in the Commitment Letter, because it failed to negotiate the interest rate between Overlook and the investor who funds the loans. As discussed supra, however, the Commitment Letter specifically sets forth that Orix is solely responsible for determining the final interest rate, and that Overlook's acceptance and execution of the Rate Lock Letter is binding. See *Emory Healthcare*, 362 Ga. App. at 821-822; see also *Pinnock*, 348 Ga. App. at 75 (1) (if a party decides to affirm and sue on the contract, the contract terms control). Accordingly, Overlook's argument is unavailing.

[6] Orix's expert, indicated that Taccati is more appropriately characterized as a consultant, not a broker, and that, in either case, fees paid to brokers and consultants are permitted so long as they are disclosed to *HUD* in the Lender's Underwriting Narrative. This expert further indicated that it is standard industry practice for lenders not to disclose to borrowers the specific terms of a broker's or consultant's compensation, other than to confirm that any fees due will be paid by the lender and not the borrower.

knew Taccati was involved in securing the loans. If the parties had intended to require Taccati's fees be disclosed, it could have easily stated so in the contract language, but they did not, and we cannot otherwise impose such a requirement. See *Emory Healthcare*, 362 Ga. App. at 821-822.

Moreover, nothing in the 2011 MAP Guide required that *all* of the consultant's fees come from the lender's fee. The 2011 MAP Guide does not limit any fees the consultant and broker agree to in connection with the sale of a loan on the secondary market. Here, the evidence shows that Orix and Taccati had executed a fee-splitting agreement wherein Taccati would be paid based not only on a percentage of Orix's origination fee, but also a percentage of the premium it received upon the sale of the loans on the secondary market. As such, whatever fees Orix agreed to pay Taccati was a separate transaction between Orix and Taccati to which Overlook was not a party. *Newitt*, 270 Ga. App. at 546 (4) (no duty to represent or advance other's interests where parties are engaged in a transaction to further their own separate business objectives).

(iv) *Fraud claims related to Greystone loan are time-barred*.

Overlook further disputes that Greystone's fraud claim is barred by the statute of limitations, arguing that the claim should be tolled because Greystone was

24

prevented from discovering Orix's fraud. Specifically, Overlook asserts that it was prevented from investigating the rates offered by other lenders, investigating the rates at which GNMA securities were traded, or from inquiring about the benefits Orix was retaining in connection with the loans. It contends Greystone did not discover Orix's fraud until 2015, making the claim timely.

Actions for fraud are governed by a 4-year statute of limitations. See OCGA § 9-3-31. "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." OCGA § 9-3-96. However, the limitations period will only be tolled if (1) there is "actual fraud involving moral turpitude," or (2) there has been "a fraudulent breach of a duty to disclose" that exists due to a confidential relationship. (Citation omitted.) *Doe v. St. Joseph's Catholic Church*, 313 Ga. 558, 561 (2) (a) (870 SE2d 365) (2022); see also *Educap, Inc.*, 341 Ga. App. at 686 ("Absent a fiduciary or confidential relationship with the defendant, the plaintiff must exercise due diligence before relying upon the representations or silence of another. . . . Thus, fraud cannot be the basis of an action if it appears that the party alleging the fraud had equal and

25

ample opportunity to prevent it and yet made it possible through the failure to exercise due diligence.") (citations and punctuation omitted).

Greystone's claims for fraud are barred by the 4-year statute of limitations. OCGA § 9-3-31. Greystone executed its loan documents with Orix and closed on the loan in 2012. Greystone did not bring suit until 2017. Although Greystone asserts it did not become aware of Orix's allegedly fraudulent dealings until 2015, its tolling argument is baseless. Again, per the loan documents, there was no fiduciary relationship between the parties and thus no duty to disclose trade premiums. *Doe*, 313 Ga. at 561 (2) (a). Further, there appears to be no dispute that Overlook, including Greystone, knew Taccati was involved in securing the loans, and thus, that he was being paid for his services by Orix. And, to the extent Greystone asserts Orix allegedly committed fraud by not disclosing the fees it was paying Taccati, such a claim could have been brought within the limitations period. Further, Greystone has presented no evidence showing that it was somehow defrauded by Orix's failure to disclose the trade premiums given that the Commitment Letter shows no requirement for Orix to do so, and the HUD regulations do not require disclosure of trade profits to the borrower. *Educap, Inc.*, 341 Ga. App. at 686. Thus, this argument fails.

(c) *RICO claims*

26

Finally, with respect to its RICO claims, Overlook generally contends that because genuine issues of material fact exist as to its breach of contract and fraud claims, summary judgment as to its RICO claims should have been denied as well. As we have concluded summary judgment was proper as to these claims, we disagree.

> The Georgia RICO Act was enacted by the Georgia legislature to impose criminal penalties against those engaged in an interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic or physical threat or injury, and civil remedies to compensate those injured by reason of such acts. Under OCGA § 16-14-4 (a), "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." To establish a valid civil RICO claim, a plaintiff must show that the defendant violated or conspired to violate Georgia's RICO Act and that the RICO violation proximately caused injury to the plaintiff . . . To satisfy the proximate cause element of RICO, a plaintiff must show that [its] injury flowed directly from at least one of the predicate acts. This burden is not met where a plaintiff shows merely that [its] injury was an eventual consequence of the predicate act or that [it] would not have been injured but for the predicate act.

(Citations and punctuation omitted.) *Najarian Capital v. Clark*, 357 Ga. App. 685, 693-694 (4) (849 SE2d 262) (2020). Under Georgia law, when the underlying actions

27

upon which a RICO claim is premised fail, the RICO claim likewise fails as a matter of law. *J. Kinson Cook of Ga. v. Heery/Mitchell*, 284 Ga. App. 552, 560 (f) (644 SE2d 440) (2007) (affirming summary judgment on RICO claims where underlying claims for fraud and conversion failed).

Here, Overlook identified theft by deception, false swearing, and wire fraud as the predicate acts. These claims are based on the same allegations underlying its claims for breach of contract and fraud. Accordingly, because Overlook failed to establish these claims, it follows that its Georgia RICO claims must necessarily fail. *J. Kinson Cook of Ga.*, 284 Ga. App. at 560 (f).

*Case No. A22A1633*

2. In its cross-appeal, Orix argues that the trial court erred by denying its motion for summary judgment as to Overlook's claim of fraudulent misrepresentation regarding HUD disclosures because Overlook failed to establish all of the elements of the claim.

In its order, the business court found that there was evidence Orix made a false statement regarding the fees it paid Taccati in the documents submitted to HUD in connection with the Overlook loan. Specifically, the court determined that Orix disclosed the "initial service charge" and the "permanent loan fee" from which it

28

would pay Taccati, but that it actually paid him more without disclosing the source of the additional funds. The business court reasoned that, even though Orix was not obligated to disclose the fees paid to Taccati, to the extent it undertook to do so, it could not misrepresent the amount of the fee.

As set forth above, to prevail on a fraud claim, including the tort of fraudulent inducement, a plaintiff must establish the following five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff. *Educap, Inc.*, 341 Ga. App. at 686; see also *CSS Real Estate Dev. I*, 324 Ga. App. at 185-186. We agree that Overlook failed to prove Orix made a false statement, and thus we must reverse the business court's denial of summary judgment.

Orix contends there was no evidence that the statement it made in the document to HUD regarding the fees paid to Taccati was false because it did, in fact, pay Taccati from the amount collected from Overlook as the lender in the transaction. Overlook has presented no evidence showing this statement was false. Again, the evidence shows that Orix and Taccati had executed a fee-splitting agreement wherein Taccati received a percentage of both the origination fee and the trade premium. Orix disclosed to HUD that it paid Taccati from the initial service charge and the

29

permanent loan fee, but it did not disclose the sums it paid Taccati upon the sale of the loans on the secondary market. The loan documents, however, do not require Orix to disclose *all* of the fees it would pay to Taccati from all sources. The fact that Orix eventually paid Taccati additional compensation as a result of selling the loan on the secondary market does not render the statement in the HUD document false. A fraud claim cannot be based on a statement that is not actually false. *Bray v. Dixon*, 176 Ga. App. 895, 896-897 (338 SE2d 872) (1985).

We, likewise, are not convinced that Orix committed fraud by omitting the full amount of fees it eventually paid to Taccati. To the extent Overlook's fraud claim is based on concealment or an omission of a material fact, it must prove not only the non-disclosure, but that there was a fiduciary or confidential relationship between the parties. *Hubbard*, 651 FSupp. at 298 (IV); see also *Educap, Inc.*, 341 Ga. App. at 686. As discussed supra, there was no fiduciary relationship between the parties, and thus Orix was not required to disclose to Overlook the total fees or compensation it paid to Taccati. Accordingly, Overlook's argument fails on this point. To the extent Overlook has failed to prove at least one point of its fraud claim, we do not address Orix's remaining arguments. *Arp*, 272 Ga. App. at 334 (3).

In essence, both parties were savvy business entities, represented by counsel, in the business of making a profit in these types of transactions. The case turns on whether Orix was *required* to disclose its profits associated with selling the loans, and Overlook has failed to show that any such disclosure was required. Therefore, based on the foregoing, we affirm the business court's grant of summary judgment in favor of Orix as to Overlook's breach of contract, fraud, and RICO claims. On Orix's cross-appeal, we reverse the court's denial of summary judgment.

*Judgments affirmed in part and reversed in part. Dillard, P. J., and Mercier, J., concur.*